AETNA LIFE INSURANCE CO. *v.* LAVOIE ET AL.

No. 84–1601.   Argued December 4, 1985—Decided April 22, 1986

814

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a concurring opinion, *post*, p. 829. BLACKMUN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 831. STEVENS, J., took no part in the consideration or decision of the case.

*Theodore B. Olson* argued the cause for appellant. With him on the briefs were *John J. Swenson, Larry L. Simms, Peter V. Sintz,* and *Wm. M. Cunningham, Jr.*

*Jack N. Goodman* argued the cause for appellees. With him on the briefs were *Alvin T. Prestwood* and *Joseph M. Brown, Jr.**

*Briefs of *amici curiae* urging reversal were filed for the Alabama Defense Lawyers Association by *Davis Carr;* for the Association of California

CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented is whether the Due Process Clause of the Fourteenth Amendment was violated when a justice of the Alabama Supreme Court declined to recuse himself from participation in that court's consideration of this case.

## I

This appeal arises out of litigation concerning an insurance policy issued by appellant covering appellees Margaret and Roger Lavoie. In January 1977, Mrs. Lavoie was examined by her physician, Dr. Douglas, because of various ailments. Shortly thereafter, on Dr. Douglas' recommendation, she was admitted to the Mobile Infirmary Hospital, where she remained for 23 days for a battery of tests.

After her discharge, the hospital forwarded the appropriate forms and medical records along with a bill for $3,028.25 to appellant's local office in Mobile, Alabama. The local office refused to pay the entire amount, tendering payment for only $1,650.22. The local office also sent a letter to the national office, concluding that the 23-day hospitalization was unnecessary and that "[h]ospital records do not indicate anything to the contrary," even though all the hospital records had not yet been received. At one point, the national office told the local office to continue denying the request for full payment, but added that "if they act like they are going to file suit," the file should be reviewed.

---

Insurance Companies et al. by *Joseph W. Rogers, Jr., Martin Quinn*, and *Susan M. Popik;* for the American Council of Life Insurance et al. by *Erwin N. Griswold, Thomas F. Cullen, Jr., Jack H. Blaine, Edward J. Zimmerman*, and *John P. Dineen;* for the American Insurance Association et al. by *Ellis J. Horvitz;* for Golden Rule Insurance Co. by *David A. Strauss;* and for the Southeastern Legal Foundation, Inc., by *G. Stephen Parker.*

Briefs of *amici curiae* urging affirmance were filed for the Alabama Trial Lawyers Association by *Lanny S. Vines;* and for the Association of California Trial Lawyers et al. by *Peter Perlman* and *Harvey R. Levine.*

Appellees filed suit against appellant, seeking both payment of the remainder of their original claim and punitive damages for the tort of bad-faith refusal to pay a valid claim. The trial court dismissed for failure to state a cause of action with respect to the bad-faith counts. Appellees appealed to the Alabama Supreme Court, which remanded on the ground that it had "not foreclosed the possibility of recovery in tort for the bad faith refusal of an insurer to pay legitimate benefits due under an insurance policy." *Lavoie* v. *Aetna Life & Casualty Co.*, 374 So. 2d 310, 312 (1979). On remand, the trial court entered judgment for appellees on the unpaid portion of their claim and granted summary judgment for appellant on the bad-faith claim. The Alabama Supreme Court again reversed, explaining that on that same day it had "recognized the intentional tort of bad faith in first party insurance actions." *Lavoie* v. *Aetna Life & Casualty Co.*, 405 So. 2d 17, 18 (1981) (citing *Chavers* v. *National Security Fire & Casualty Co.*, 405 So. 2d 1 (1981)). On remand, appellees' bad-faith claim was submitted to a jury. The jury awarded $3.5 million in punitive damages. The trial judge denied appellant's motion for judgment n.o.v. or, alternatively, for remittitur.

The Alabama Supreme Court affirmed the award in a 5-to-4 decision. 470 So. 2d 1060 (1984). An unsigned *per curiam* opinion expressed the view of five justices that the evidence demonstrated that appellant had acted in bad faith. The court interpreted its prior opinions as not requiring dismissal of a bad-faith-refusal-to-pay claim even where a directed verdict against the insurer on the underlying claim was impossible. The opinion also clarified the issue of whether a bad-faith suit could be maintained where the insurer had made a partial payment of the underlying claim. Although earlier opinions of the court had refused to allow bad-faith suits in such circumstances, partial payment was not dispositive of

the bad-faith issue. The court also rejected appellant's argument that the punitive damages award was so excessive that it must be set aside.

Chief Justice Torbert, joined by Justice Beatty, dissented; Justice Maddox, joined by Justice Shores, also dissented, concluding that the case was controlled by the court's earlier decision in *National Savings Life Ins. Co.* v. *Dutton*, 419 So. 2d 1357 (1982), because there was an arguable reason for appellant's refusal to pay the claim.

The court's opinion was released on December 7, 1984; on December 21, 1984, appellant filed a timely application for rehearing. On February 14, 1985, before its application had been acted on, appellant learned that while the instant action was pending before the Alabama Supreme Court, Justice Embry, one of the five justices joining the *per curiam* opinion, had filed two actions in the Circuit Court for Jefferson County, Alabama, against insurance companies. Both of these actions alleged bad-faith failure to pay a claim. One suit arose out of Maryland Casualty Company's alleged failure to pay for the loss of a valuable mink coat; the other suit, which Justice Embry brought on behalf of himself and as a representative of a class of all other Alabama state employees insured under a group plan by Blue Cross-Blue Shield of Alabama (including, apparently, all justices of the Alabama Supreme Court), alleged a willful and intentional plan to withhold payment on valid claims. Both suits sought punitive damages.

On February 21, 1985, appellant filed two motions in the Alabama Supreme Court, challenging Justice Embry's participation in the court's December 7, 1984, decision and his continued participation in considering appellant's application for rehearing. The motion also alleged that all justices on the court should recuse themselves because of their interests as potential class members in Justice Embry's suit against Blue Cross. On March 8, 1985, the court unanimously de-

nied the recusal motions. The brief order stated that each justice had voted individually on the matter of whether he should recuse himself and that each justice had voted not to do so. At the same time, by a 5-to-4 division, the court denied appellant's motion for rehearing.

Chief Justice Torbert wrote separately, explaining that although his views had not been influenced by his possible membership in the putative class alleged in Justice Embry's suit against Blue Cross, he was nonetheless notifying the Clerk of the court where that suit was pending not to permit him to be included in the alleged class. Justice Maddox also wrote separately, taking similar action.

On March 20, 1985, appellant obtained a copy of the transcript of Justice Embry's deposition, taken on January 10, 1985, in connection with his Blue Cross suit. The deposition revealed that Justice Embry had authored the *per curiam* opinion in this case over an 8- or 9-month period during which his civil action against Blue Cross was being prosecuted. Justice Embry also stated that, during that period, he had received "leads" from people with regard to his bad-faith action against Blue Cross and that he put them in touch with his attorney. Finally, Justice Embry revealed frustration with insurance companies. For example, when asked if he had ever had any difficulty with processing claims, Justice Embry retorted: "[T]hat is a silly question. For years and years."

Appellant moved for leave to file a second application for rehearing based on the deposition, but that motion was denied. Appellant filed an appeal with this Court, and JUSTICE POWELL, as Circuit Justice, granted appellant's application for a stay of the judgment below pending this Court's disposition of the appeal. Shortly thereafter, Justice Embry's suit against Blue Cross was settled by stipulation of the parties.[1] In the stipulation, Blue Cross recognized that "some problems have occurred in the past and is determined

---

[1] Justice Embry's suit against Maryland Casualty Company had been settled sometime earlier by the payment of Justice Embry's claim.

to minimize them in the future." Justice Embry received $30,000 under the settlement agreement on a basic compensatory claim of unspecified amount; a check for that sum was deposited by his attorney directly into Justice Embry's personal account.

We postponed consideration of the question of jurisdiction pending argument on the merits. 471 U. S. 1134 (1985). We now vacate and remand.

## II

We are satisfied as to the Court's jurisdiction over the question of whether Justice Embry's participation violated appellant's Fourteenth Amendment due process rights. Appellees argue that the Alabama Supreme Court did not reach this issue because it was raised only after the court's decision on the merits. We reject that contention as at odds with the record. On March 8, 1985, the court entered the following order:

> "Upon consideration, the Court is of the opinion that under the allegation of said motion in this case each justice should vote individually on the matter of whether or not he or she is disqualified and should recuse. Each justice having voted not to recuse,
>
> "IT IS, THEREFORE, ORDERED that the 'Motion for Disqualification and Motion for Withdrawal of Opinion of December 7, 1984, and for Hearing De Novo' be . . . denied." App. to Juris. Statement 64a.

This order clearly demonstrates that the Alabama court reached the merits of appellant's constitutional challenge, albeit on a justice-by-justice basis. Moreover, appellant raised this issue as soon as it discovered the facts relating to Justice Embry's personal lawsuits. On this record, we conclude jurisdiction is proper. See *Ulster County Court* v.

*Allen*, 442 U. S. 140, 147–154 (1979); *Ward* v. *Village of Monroeville*, 409 U. S. 57, 61 (1972).

## III

### A

Appellant contends Justice Embry's general hostility towards insurance companies that were dilatory in paying claims, as expressed in his deposition, requires a conclusion that the Due Process Clause was violated by his participation in the disposition of this case. The Court has recognized that not "[a]ll questions of judicial qualification . . . involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion." *Tumey* v. *Ohio*, 273 U. S. 510, 523 (1927); see also *FTC* v. *Cement Institute*, 333 U. S. 683, 702 (1948) ("[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level"). Moreover, the traditional common-law rule was that disqualification for bias or prejudice was not permitted. See, *e. g., Clyma* v. *Kennedy*, 64 Conn. 310, 29 A. 539 (1894). See generally Frank, Disqualification of Judges, 56 Yale L. J. 605 (1947). As Blackstone put it, "the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." 3 W. Blackstone, Commentaries *361. The more recent trend has been towards the adoption of statutes that permit disqualification for bias or prejudice. See *Berger* v. *United States*, 255 U. S. 22, 31 (1921) (enforcing statute disqualifying federal judges in certain circumstances for personal bias or prejudice). See also ABA Code of Judicial Conduct, Canon 3C(1)(a) (1980) ("A judge should disqualify himself . . . where he has a personal bias or prejudice concerning a party"). But that alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause.

We held in *Patterson* v. *New York,* 432 U. S. 197, 201–202 (1977) (citations omitted), that

> "it is normally within the power of the State to regulate procedures under which its laws are carried out . . . and its decision in this regard is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."

We need not decide whether allegations of bias or prejudice by a judge of the type we have here would ever be sufficient under the Due Process Clause to force recusal. Certainly only in the most extreme of cases would disqualification on this basis be constitutionally required, and appellant's arguments here fall well below that level. Appellant suggests that Justice Embry's general frustration with insurance companies reveals a disqualifying bias, but it is likely that many claimants have developed hostile feelings from the frustration in awaiting settlement of insurance claims. Insurers, on their side, have no easy task, especially when trying to evaluate whether certain medical diagnostic tests or prolonged hospitalization were indicated. In turn, the physicians and surgeons, whether impelled by valid medical judgment or by apprehension as to future malpractice claims—or some combination of the two—similarly face difficult problems. Appellant's allegations of bias and prejudice on this general basis, however, are insufficient to establish any constitutional violation.

### B

The record in this case presents more than mere allegations of bias and prejudice, however. Appellant also presses a claim that Justice Embry had a more direct stake in the outcome of this case. In *Tumey,* while recognizing that the Constitution does not reach every issue of judicial qualification, the Court concluded that "it certainly violates the Fourteenth Amendment . . . to subject [a person's] liberty or

property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." 273 U. S., at 523.

More than 30 years ago Justice Black, speaking for the Court, reached a similar conclusion and recognized that under the Due Process Clause no judge "can be a judge in his own case [or be] permitted to try cases where he has an interest in the outcome." *In re Murchison,* 349 U. S. 133, 136 (1955). He went on to acknowledge that what degree or kind of interest is sufficient to disqualify a judge from sitting "cannot be defined with precision." *Ibid.* Nonetheless, a reasonable formulation of the issue is whether the

> "situation is one 'which would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true.'" *Ward* v. *Village of Monroeville, supra,* at 60.

Under these prior holdings, we examine just what factors might constitute such an interest in the outcome of this case that would bear on recusal. At the time Justice Embry cast the deciding vote and authored the court's opinion, he had pending at least one very similar bad-faith-refusal-to-pay lawsuit against Blue Cross in another Alabama court. The decisions of the court on which Justice Embry sat,[2] the Alabama Supreme Court, are binding on all Alabama courts. We need not blind ourselves to the fact that the law in the area of bad-faith-refusal-to-pay claims in Alabama, as in many other jurisdictions, was unsettled at that time, as the court's close division in deciding this case indicates. When Justice Embry cast the deciding vote, he did not merely apply well-established law and in fact quite possibly made new law; the court's opinion does not suggest that its conclusion was compelled by earlier decisions. Instead, to decide the case the court stated that "it is first necessary to review the policy considerations, elements, and instructive guide

---

[2] Justice Embry has since retired from the court for health reasons.

posts set out by this court in earlier case law." 470 So. 2d, at 1070. And in another case the court acknowledged that "the tort of bad faith refusal to pay a valid insurance claim is in the embryonic stage, and the Court has not had occasion to address every issue that might arise in these cases." *National Savings Life Ins. Co.* v. *Dutton*, 419 So. 2d, at 1362.

The decision under review firmly established that punitive damages could be obtained in Alabama in a situation where the insured's claim is not fully approved and only partial payment of the underlying claim had been made. Prior to the decision under review, the Alabama Supreme Court had not clearly recognized any claim for tortious injury in such circumstances; moreover, it had affirmatively recognized that partial payment was evidence of good faith on the part of the insurer. *Sexton* v. *Liberty National Life Ins. Co.*, 405 So. 2d 18, 22 (1981). The Alabama court also held that a bad-faith-refusal-to-pay cause of action will lie in Alabama even where the insured is not entitled to a directed verdict on the underlying claim, a conclusion that at the least clarified the thrust of an earlier holding. Cf. *National Savings Life Ins. Co.* v. *Dutton, supra*, at 1362. Finally, the court refused to set aside as excessive a punitive damages award of $3.5 million. The largest punitive award previously affirmed by that court was $100,000, a figure remitted from $1.1 million as "obviously the result of passion and prejudice on the part of the jury." *Gulf Atlantic Life Ins. Co.* v. *Barnes*, 405 So. 2d 916, 926 (1981).

All of these issues were present in Justice Embry's lawsuit against Blue Cross. His complaint sought recovery for partial payment of claims. Also the very nature of Justice Embry's suit placed in issue whether he would have to establish that he was entitled to a directed verdict on the underlying claims that he alleged Blue Cross refused to pay before gaining punitive damages. Finally, the affirmance of the largest punitive damages award ever (by a substantial margin) on precisely the type of claim raised in the Blue Cross

suit undoubtedly "raised the stakes" for Blue Cross in that suit, to the benefit of Justice Embry. Thus, Justice Embry's opinion for the Alabama Supreme Court had the clear and immediate effect of enhancing both the legal status and the settlement value of his own case.

We need not decide whether to characterize the decision under review as a change in Alabama law or a clarification of the contours of that law, a judgment we are obviously not called on to make. We hold simply that when Justice Embry made that judgment, he acted as "a judge in his own case." *Murchison, supra,* at 136.

We also hold that his interest was "'direct, personal, substantial, [and] pecuniary.'" *Ward, supra,* at 60 (quoting *Tumey* v. *Ohio,* 273 U. S., at 523). Justice Embry's complaint against Blue Cross sought "compensatory damage for breach of contract, inconvenience, emotional and mental distress, disappointment, pain and suffering" in addition to punitive damages for himself and for the class. Soon after the opinion of the Alabama Supreme Court in this case was announced, Blue Cross paid Justice Embry what he characterized in an interview as "a tidy sum," Reply Brief for Appellant 10, n. 8, to settle the suit. Records lodged with this Court show that Justice Embry received $30,000, which was deposited by his attorney directly into Justice Embry's personal account. To be sure, a portion of this money may have gone to Justice Embry's attorney in connection with the case, even though some materials before us suggest that his attorney agreed to waive his fee. Deposition of A. Grey Till in *Clay* v. *Nationwide Insurance Co.,* CV–78–1148 (Cir. Ct. of Mobile Cty., Ala.), pp. 27–29. We are also aware that Justice Embry obtained a statement in the settlement agreement to the effect that "[t]he primary object of the institution of this suit . . . was to emphasize to defendant Blue Cross . . . that claims under the Plan be processed and determined by Blue Cross in a timely and efficient manner," even though that type of relief was not sought specifically in the complaint

while monetary relief was. We nonetheless hold that the "tidy sum" that Justice Embry received directly is sufficient to establish the substantiality of his interest here.

We conclude that Justice Embry's participation in this case violated appellant's due process rights as explicated in *Tumey, Murchison,* and *Ward.* We make clear that we are not required to decide whether in fact Justice Embry was influenced, but only whether sitting on the case then before the Supreme Court of Alabama "'would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true.'" *Ward,* 409 U. S., at 60 (quoting *Tumey* v. *Ohio, supra,* at 532). The Due Process Clause "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, 'justice must satisfy the appearance of justice.'" *Murchison,* 349 U. S., at 136 (citation omitted).

## C

Appellant has challenged not only the participation of Justice Embry in this case but also the participation of all the other justices of the Alabama Supreme Court, or at least the six justices who did not withdraw from Justice Embry's class action against Blue Cross, claiming that they also have an interest in this case. Such allegations do not constitute a sufficient basis for requiring recusal under the Constitution. In the first place, accepting appellant's expansive contentions might require the disqualification of every judge in the State. If so, it is possible that under a "rule of necessity" none of the judges or justices would be disqualified. See *United States* v. *Will,* 449 U. S. 200, 214 (1980).

More important, while these justices might conceivably have had a slight pecuniary interest,[3] we find it impossible to

---

[3] The Court in *Commonwealth Coatings Corp.* v. *Continental Casualty Co.,* 393 U. S. 145 (1968), stated in dicta that "in *Tumey*[, 273 U. S., at 524,] the Court held that a decision should be set aside where there is 'the

characterize that interest as "'direct, personal, substantial, [and] pecuniary.'" *Ward, supra,* at 60 (quoting *Tumey, supra,* at 523). Appellant concedes that nothing in the record even suggests that these justices had any knowledge of the class action before the court issued a decision on the merits. Thus, at most only the decision to deny rehearing was even plausibly affected. Any interest that they might have had when they passed on the rehearing motion was clearly highly speculative and contingent. At the time, the trial court had not even certified a class, let alone awarded any class relief of a pecuniary nature. With the proliferation of class actions involving broadly defined classes, the application of the constitutional requirement of disqualification must be carefully limited. Otherwise constitutional disqualification arguments could quickly become a standard feature of class-action litigation. Cf. *In re City of Houston,* 745 F. 2d 925 (CA5 1984). At some point, "[t]he biasing influence . . . [will be] too remote and insubstantial to violate the constitutional constraints." *Marshall* v. *Jerrico, Inc.,* 446 U. S. 238, 243 (1980). Charges of disqualification should not be

---

slightest pecuniary interest' on the part of the judge . . . ." *Id.,* at 148. We think this was a misreading of *Tumey.* The reference to "the slightest pecuniary interest" in that opinion came in a portion of the opinion describing "cases at common law in England prior to the separation of colonies from the mother country . . . ." 273 U. S., at 524. At a later point in the opinion, Chief Justice Taft quoted approvingly from the work of Justice Cooley, that disqualification is not worked in cases where the "'interest is so remote, trifling and insignificant that it may fairly be supposed to be incapable of affecting the judgment of or of influencing the conduct of an individual.'" *Id.,* at 531 (quoting T. Cooley, Constitutional Limitations 594 (7th ed. 1903)). Chief Justice Taft also reiterated that the case was not one "in which the penalties and the costs are negligible. . . . The court is a state agency, imposing substantial punishment . . . . It is not to be treated as a mere village tribunal for village peccadilloes." 273 U. S., at 532. We therefore follow *Ward* v. *Village of Monroeville,* 409 U. S. 57, 60 (1972), and decline to read *Tumey* as constitutionalizing any rule that a decision rendered by a judge with "the slightest pecuniary interest" constitutes a violation of the Due Process Clause.

made lightly. See *Rooker* v. *Fidelity Trust Co.*, 263 U. S. 413 (1923). We hold that there is no basis for concluding these justices were disqualified under the Due Process Clause.

## D

Having concluded that only Justice Embry was disqualified from participation in this case, we turn to the issue of the proper remedy for this constitutional violation. Our prior decisions have not considered the question whether a decision of a multimember tribunal must be vacated because of the participation of one member who had an interest in the outcome of the case. Rather, our prior cases have involved interpretations of statutes with provisions concerning this question, *e. g.*, *Commonwealth Coatings Corp.* v. *Continental Casualty Co.*, 393 U. S. 145 (1968), disqualifications of the sole member of a tribunal, *e. g.*, *Ward* v. *Village of Monroeville*, *supra*, and disqualifications of an entire panel, *e. g.*, *Gibson* v. *Berryhill*, 411 U. S. 564 (1973). Some courts have concluded that a decision need not be vacated where a disqualified judge's vote is mere surplusage. See, *e. g.*, *State ex rel. Langer* v. *Kositzky*, 38 N. D. 616, 166 N. W. 534 (1918); but see, *e. g.*, *Oakley* v. *Aspinwall*, 3 N. Y. 547 (1850).[4] But we are aware of no case, and none has been called to our atten-

---

[4] We have confined the opinion to the issues presented by the parties and express no view on the question discussed by the justices who write separately. The issues here are far more complex than acknowledged by the concurrences, which, reasoning from hypothetical situations on matters not presented by the facts of this case, postulate a broad general rule. Traditionally the Court does not undertake to "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring) (quoting *Liverpool, N. Y. & P. S. S. Co.* v. *Emigration Comm'rs*, 113 U. S. 33, 39 (1885)). Because the issue of disqualification of a single member of a multimember panel arises in a variety of factual contexts, see generally 48A C. J. S., Judges § 159, p. 868 (1981) (collecting cases), sound judicial practice wisely counsels judges to avoid unnecessary declarations on issues not presented, briefed, or argued.

tion, permitting a court's decision to stand when a disqualified judge casts the deciding vote. Here Justice Embry's vote was decisive in the 5-to-4 decision[5] and he was the author of the court's opinion. Because of Justice Embry's leading role in the decision under review, we conclude that the "appearance of justice" will best be served by vacating the decision and remanding for further proceedings. Appellees have not contended that, upon a finding of disqualification, this disposition is improper.

## III

We underscore that our decision today undertakes to answer only the question of under what circumstances the Constitution requires disqualification. The Due Process Clause demarks only the outer boundaries of judicial disqualifications. Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification than those we find mandated here today.

Appellant also argues that the retrospective imposition of punitive damages under a new cause of action violates its rights under the Contracts Clause of Article I, § 10; that a $3.5 million punitive damages award is impermissible under the Excessive Fines Clause of the Eighth Amendment; and that lack of sufficient standards governing punitive damages awards in Alabama violates the Due Process Clause of the Fourteenth Amendment. In addition, appellant contends that Ala. Code § 12–22–72 (1975), under which any person who unsuccessfully appeals a money judgment is assessed a 10% penalty, is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. These arguments raise important issues which, in an appropriate setting, must

---

[5] If Justice Embry had disqualified himself, the decision of the trial court would not have been affirmed by a vote of an equally divided court. Rather, Ala. Code § 12–2–14 (1975), which authorizes the appointment of special justices in the event disqualifications result in an even-numbered court which is evenly divided on a matter, would presumably have come into play.

be resolved; however, our disposition of the recusal-for-bias issue makes it unnecessary to reach them.

The judgment of the Supreme Court of Alabama is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*Vacated and remanded.*

JUSTICE STEVENS took no part in the consideration or decision of this case.

JUSTICE BRENNAN, concurring.

I agree with the Court that, given Justice Embry's interest in the outcome of this case, his participation in its disposition violated due process. As the Court notes, resolution of the issues raised in the appeal below enhanced the viability and settlement value of Justice Embry's own lawsuit. Such an interest clearly required recusal under our decisions in *Tumey* v. *Ohio*, 273 U. S. 510 (1927); *In re Murchison*, 349 U. S. 133 (1955); *Ward* v. *Village of Monroeville*, 409 U. S. 57 (1972); and *Gibson* v. *Berryhill*, 411 U. S. 564 (1973). As Justice Black explained in *In re Murchison:*

> "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome." 349 U. S., at 136.

I write separately to set forth my understanding of certain statements in the Court's opinion. *First*, the Court stresses that Justice Embry's interest was "'direct, personal, substantial, [and] pecuniary.'" *Ante*, at 824 (quoting *Ward*, *supra*, at 60); see also *ante*, at 826. I do not understand that by this language the Court states that only an interest that satisfies this test will taint the judge's participation as a due process violation. Nonpecuniary interests, for example, have been found to require recusal as a matter of due proc-

ess. See, *e. g.*, *In re Murchison, supra* (judge who presided over a "one-man grand jury" also presided over contempt proceedings relating to events which took place in the grand jury proceedings). Moreover, as this case demonstrates, an interest is sufficiently "direct" if the outcome of the challenged proceeding substantially advances the judge's opportunity to attain some desired goal even if that goal is not actually attained in that proceeding. See, *e. g.*, *Ward* v. *Village of Monroeville, supra* (mayor's adjudication of traffic fines, which contributed to city finances, violated due process); *Gibson* v. *Berryhill, supra* (proceedings by Alabama Board of Optometry enjoined because Board members were competitors of petitioners and therefore stood to gain competitively). Nothing in the Court's opinion should be read, as I understand it, to limit these precedents in any way. Rather, the Court clearly indicates the contrary in acknowledging that the interests which trigger due process condemnation "'cannot be defined with precision.'" *Ante*, at 822 (quoting *In re Murchison, supra*, at 136).

*Second*, the Court points out that Justice Embry obtained a favorable settlement in his own lawsuit several months after the Alabama Supreme Court handed down its decision in this case. But even without that settlement, Justice Embry's participation in this case deprived appellant of due process. The deprivation occurred when Justice Embry took part in the deliberations and decision of the Alabama Supreme Court in this case. At most—and, again, I do not read the Court's opinion to say otherwise—the fact of the later settlement merely confirms that Justice Embry had a substantial interest in the outcome of this case.

*Finally*, I understand that the Court's opinion is not to be read to suggest that the outcome might be different had Justice Embry not provided the necessary fifth vote in the court below. That fact too is irrelevant—Justice Embry's participation in the court's resolution of the case, while he was fully aware of his interest in its outcome, was sufficient

in itself to impugn the decision. The description of an opinion as being "for the court" connotes more than merely that the opinion has been joined by a majority of the participating judges. It reflects the fact that these judges have exchanged ideas and arguments in deciding the case. It reflects the collective process of deliberation which shapes the court's perceptions of which issues must be addressed and, more importantly, how they must be addressed. And, while the influence of any single participant in this process can never be measured with precision, experience teaches us that each member's involvement plays a part in shaping the court's ultimate disposition. The participation of a judge who has a substantial interest in the outcome of a case of which he knows at the time he participates *necessarily* imports a bias into the deliberative process. This deprives litigants of the assurance of impartiality that is the fundamental requirement of due process.

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL joins, concurring in the judgment.

I join the Court's judgment that Justice Embry's participation in this case denied appellant the impartial decisionmaker required by the Due Process Clause. I write separately, however, to stress that the constitutional violation in this case should not depend on the Court's apparent belief that Justice Embry cast the deciding vote—a factual assumption that may be incorrect and, to my mind, should be irrelevant to the Court's analysis. For me, Justice Embry's mere participation in the shared enterprise of appellate decision-making—whether or not he ultimately wrote, or even joined, the Alabama Supreme Court's opinion—posed an unacceptable danger of subtly distorting the decisionmaking process.

The Court states that a decision cannot be permitted to stand "when a disqualified judge casts the deciding vote. Here, Justice Embry's vote was decisive in the 5-to-4 decision and he was the author of the court's opinion." *Ante,* at 828. In a footnote, the Court elaborates on the decisiveness

of Justice Embry's vote: had he disqualified himself, the decision of the trial court would not have been affirmed by an equally divided court because, under Alabama law, a special justice would have been appointed to break the tie. *Ante*, at 828, n. 5.

The record, however, casts doubt upon the Court's suggestion that Justice Embry provided the most crucial vote. Justice Embry's deposition testimony in the Blue Cross suit suggests that the initial vote of the Alabama Supreme Court was in fact to reverse the decision of the trial court in favor of the Lavoies. Accordingly, Justice Embry began work on a dissent. App. to Juris. Statement 168a–169a. After Justice Embry began writing, however, at least one justice switched his vote. Justice Embry's proposed dissent ultimately was issued as the *per curiam* opinion of the court. He explained: "It's customary a lot of times [to issue an opinion as a *per curiam*], if it's been assigned to you because the other opinion didn't prevail . . . ." *Id.*, at 167a.

We cannot know what led each justice on the Alabama Supreme Court to the position he or she reached in this case. But we do know, from our own experience on this nine-Member Court, that a forceful dissent may lead Justices to rethink their original positions and change their votes. And to suggest that the author of an opinion where the final vote is 5 to 4 somehow plays a peculiarly decisive "leading role," *ante*, at 828, ignores the possibility of a case where the author's powers of persuasion produce an even larger margin of votes. It makes little sense to intimate that if Justice Embry's dissent had led two colleagues to switch their votes, and the final vote had been 6 to 3, Aetna would somehow not have been injured by his participation.

More importantly, even if Justice Embry had not written the court's opinion, his participation in the case would have violated the Due Process Clause. Our experience should tell us that the concessions extracted as the price of joining

an opinion may influence its shape as decisively as the sentiments of its nominal author. To discern a constitutionally significant difference between the author of an opinion and the other judges who participated in a case ignores the possibility that the collegial decisionmaking process that is the hallmark of multimember courts led the author to alter the tone and actual holding of the opinion to reach a majority, or to attain unanimity. And because this collegial exchange of ideas occurs in private, a reviewing court may never discover the actual effect a biased judge had on the outcome of a particular case. We should not attempt the perhaps futile task of distilling Justice Embry's particular contribution to determine whether the result would have been the same had he disqualified himself at the outset. I would not want other appellate courts to read the Court's opinion today to suggest that such an inquiry provides an appropriate guarantee of due process.

The violation of the Due Process Clause occurred when Justice Embry sat on this case, for it was then the danger arose that his vote and his views, potentially tainted by his interest in the pending Blue Cross suit, would influence the votes and views of his colleagues. The remaining events — that another justice switched his vote and that Justice Embry wrote the court's opinion—illustrate, but do not create, the constitutional infirmity that requires us to vacate the judgment of the Alabama Supreme Court.