In the

# United States Court of Appeals

### For the Seventh Circuit

No. 03-4201

ULECE MONTGOMERY,

*Petitioner-Appellant,*

*v.*

ALAN M. UCHTMAN, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 7486—**Amy J. St. Eve**, *Judge.*

ARGUED JUNE 1, 2005—DECIDED OCTOBER 20, 2005

Before BAUER, RIPPLE, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* This *habeas corpus* appeal arises from Ulece Montgomery's conviction in June 1983 for the murders of two elderly women and his subsequent death sentence. Montgomery argues that the trial and sentencing violated due process and that he received ineffective assistance of counsel. He also contends that his waivers of his right to a jury at trial and sentencing were not knowing and voluntary. The district court rejected his claims and denied his petition; so do we.

## I.  Background

### A.  The Double Homicide, Trial, and Sentencing

On April 25, 1981, Montgomery beat and strangled to death 72-year-old Pearl Briggs and 68-year-old Betty Tyson. After beating each woman unconscious and possibly after they were dead, Montgomery raped them. After his apprehension, he gave a detailed confession of these crimes.

Miss Briggs owned two buildings in Robbins, Illinois. She lived in one with her sister, Mrs. Tyson, and rented the adjacent building to Montgomery's girlfriend. At the time of the attacks, Montgomery had been living with his girlfriend in the house for approximately two months. On the evening of April 25, 1981, Montgomery walked to Miss Briggs' house to pick up a couch. Miss Briggs took him to the basement of her building, where the couch was located. There, Montgomery knocked Miss Briggs unconscious, removed her clothes, and raped her. She died of strangulation. Montgomery's fingerprint was found on the lens of her glasses, his jacket was spattered with blood that matched her blood type but not his, and a hair consistent with his hair was found under her fingernail.

Montgomery then walked upstairs to Miss Briggs' apartment. When Mrs. Tyson opened the door, he pushed her down, removed her stockings, and wrapped them around her neck. When she was no longer conscious, he raped her. Mrs. Tyson died of strangulation. Montgomery's palm print was found on a camera case on a couch near Mrs. Tyson's head, and a hair consistent with her hair was found on his T-shirt.

A police investigator who came to the house that evening noticed Montgomery standing outside, acting suspiciously. He saw that Montgomery's hands were scraped and that he had blood on his pants. The investigator approached Montgomery, who agreed to go with the investigator to the police station. At the station, Montgomery gave hair

samples, fingerprints, and palm prints; he also allowed the police to test his clothing.

Montgomery was subsequently charged with the murders of Miss Briggs and Mrs. Tyson. He originally chose to be tried by a jury, but, on March 15, 1983, Montgomery overheard a prospective juror say that he could convict Montgomery just by looking at him. During that day, defense attorney John McNamara contacted Judge Samuels to schedule a conference. When the prosecution refused to participate, Judge Samuels ruled that there could be no meeting without the participation of both parties. That evening, Montgomery attempted to commit suicide in his cell. As a result, Judge Samuels declared a mistrial.

Three months later, Montgomery was declared fit to stand trial. On June 10, 1983, three days before trial, defense attorneys McNamara and Michael Morrissey met with Judge Samuels in his chambers. In addition, two assistant state's attorneys were present, neither of whom were assigned to Montgomery's case. McNamara and Morrissey told the judge that Montgomery was going to elect a stipulated bench trial instead of a jury trial and that he was going to waive a jury for sentencing. As they were talking, Assistant State's Attorney Scott Arthur, the lead prosecutor in the case, entered chambers. Arthur became furious and accused McNamara, Morrissey, and Judge Samuels of trying to "back door" him. R. at 855. Judge Samuels assured Arthur that nothing improper had occurred and invited him to join the meeting. Arthur refused and ordered the other two prosecutors to leave with him, which they did. McNamara and Morrissey followed them out.

On June 13, 1983, Montgomery waived his right to a jury trial and proceeded to a stipulated bench trial. Judge Samuels found him guilty of the two murders. Montgomery also chose to waive a jury for purposes of a death penalty hearing. In the first stage of the hearing, the parties stipulated to the introduction of the evidence presented

at trial. Judge Samuels then made findings that rendered Montgomery eligible for the death penalty.

During the second stage of the sentencing hearing, the parties presented evidence in aggravation and mitigation. The State introduced evidence that included the following. In 1966, when Montgomery was 9 years old, he stuck a Coke bottle onto the penis of his 3-year-old brother, Darryl, which required medical personnel to remove. In 1969, when Montgomery was 12 years old, he attempted to rape his 11-year-old sister, Rene. In 1970, when he was 13 years old, he raped his 5-year-old half-brother, Eugene. In 1976, when Montgomery was 19 years old, he on two occasions raped his 11-year-old half-sister, Jean, who became pregnant and had an abortion. Montgomery was convicted of contributing to the sexual delinquency of a minor. Montgomery also had two other prior convictions, both for possession of a stolen motor vehicle.

In mitigation, Montgomery's relatives testified that he was very drunk immediately after the murders. They also testified about the deprived conditions in their home during his childhood and his parents' alcoholism. Dr. Steven Porter testified that Montgomery was acting under extreme emotional disturbance at the time of the murders because of the amount of alcohol he had consumed. Dr. Albert Stipes did not agree that Montgomery had acted under extreme emotional disturbance, but he diagnosed Montgomery as having "alcohol dependency and antisocial personality disorder with stimulant abuse." *People v. Montgomery*, 736 N.E.2d 1025, 1031 (2000).

Judge Samuels found that Montgomery was not acting under extreme emotional disturbance when he committed the murders. He also noted that Montgomery's intoxication was voluntary and that he had a history of preying on the weak and elderly. As a result, Judge Samuels determined that there were no mitigating factors sufficient to pre-

clude imposition of a death sentence.

On April 4, 1986, the Illinois Supreme Court affirmed Montgomery's convictions and sentences. *Certiorari* was denied on February 23, 1987.

## B. The Post-Conviction Proceedings

On December 14, 1987, Montgomery filed a post-conviction petition in the circuit court of Cook County. He claimed, for the first time, that Judge Samuels was biased because defense counsel had *ex parte* meetings with him in which he allegedly promised that he would not impose the death penalty if Montgomery waived his right to a jury for both trial and sentencing. The circuit court denied the petition. Montgomery appealed to the Illinois Supreme Court, arguing that he had not had a full and fair opportunity to cross-examine Judge Samuels. The court remanded with directions to reopen the hearing to allow Montgomery to fully cross-examine all of the witnesses.

Pursuant to Montgomery's request for a change of venue, a new hearing on Montgomery's claims of judicial misconduct and ineffective assistance of counsel was conducted in October and November 1996 by Judge Michael Weber of the Fourth Judicial District in Jasper County, Illinois. At this hearing, Judge Samuels testified that he had not made an *ex parte* offer to sentence Montgomery to natural life. He further stated that if he had ever met with defense attorneys McNamara or Morrissey *ex parte*, the only topic they would have discussed was scheduling.

Defense attorneys McNamara and Morrissey testified that they had met with Judge Samuels on three occasions. McNamara testified as to the first of these meetings. In April 1983, he met with Judge Samuels *ex parte* to discuss scheduling. After McNamara described the evidence he expected the State to introduce, Judge Samuels sug-

gested pleading Montgomery guilty. McNamara expressed concern about making a blind plea in a capital case, to which Judge Samuels allegedly replied: "As far as that's concerned, why don't you look at my record." R. at 838.

Defense counsel Morrissey testified as to the second meeting. In April 1983, he met with Judge Samuels *ex parte* to discuss scheduling. Morrissey told the judge that Montgomery would be electing a jury trial, and Judge Samuels replied that Montgomery should plead guilty and that he would impose a life sentence, again referring to his track record. Both defense counsel testified as to the June 10, 1983 meeting with Judge Samuels, which was also attended by two assistant state's attorneys and ended when Assistant State's Attorney Arthur arrived.

After weighing the evidence, Judge Weber determined that the claimed *ex parte* communication from Judge Samuels promising a life sentence in exchange for a jury waiver "simply did not exist." *Montgomery*, 736 N.E.2d at 1037. In so ruling, he found that Judge Samuels was credible and that defense attorneys McNamara and Morrissey were not. He also found that it would be "totally. . . out of character" for Judge Samuels to hold an *ex parte* meeting after he had previously rejected a plea conference because the State would not participate. *Id.* Thus, Judge Weber denied the post-conviction petition.

On June 15, 2000, the Illinois Supreme Court affirmed Judge Weber's ruling, deferring to his credibility determinations. In so ruling, the court opined that defense attorneys McNamara and Morrissey "might have been hoping to hear an indication from the trial judge about what sentence he would impose in this case, and counsel could have misrepresented the judge's comments." *Montgomery*, 736 N.E.2d at 1038. On June 4, 2001, the United States Supreme Court denied Montgomery's petition for *certiorari*.

On September 27, 2001, Montgomery filed a petition for

a writ of *habeas corpus*. On January 10, 2003, former Governor Ryan commuted Montgomery's sentence from death to natural life without the possibility for parole. On September 8, 2003, the district court denied *habeas* relief; she also denied a certificate of appealability. On August 16, 2004, we granted Montgomery's request for a certificate of appealability as to the constitutional challenges connected to the *ex parte* discussions.

## II. Discussion

Montgomery argues that the Illinois Supreme Court's decisions that his trial and sentencing comported with due process and that he received effective assistance of counsel were contrary to or based on an unreasonable application of Supreme Court precedent. He also claims that the court's conclusion that he knowingly and voluntarily waived his right to a trial and sentencing by jury was premised on an unreasonable determination of the facts in light of the evidence presented at his 1996 post-conviction hearing. Montgomery maintains that the district court erred in concluding otherwise and that we should reverse the court's denial of his petition for *habeas corpus*.

Because Montgomery filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the AEDPA governs our review. *Lindh v. Murphy*, 521 U.S. 320, 322 (1997); *Martin v. Evans*, 384 F.3d 848, 851 (7th Cir. 2004). The AEDPA provides that *habeas* relief may not be granted as to any claim adjudicated on its merits in state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We review the district court's decision

denying Montgomery's *habeas* relief *de novo*. *Harris v. Cotton*, 365 F.3d 552, 555 (7th Cir. 2004).

## A. Due Process

We begin with Montgomery's claim that Judge Samuels' failure to recuse himself after Assistant State's Attorney Arthur discovered him taking part in the June 10, 1983 meeting deprived Montgomery of due process. Montgomery maintains that the Illinois Supreme Court's failure to recognize *Tumey v. Ohio*, 273 U.S. 510 (1927), in its rejection of his claim resulted in an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). A state court's application of clearly established federal law is unreasonable only if it is objectively unreasonable, which requires that it lie "well outside the boundaries of permissive differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002).

The Due Process Clause guarantees litigants an impartial judge. *See In re Murchison*, 349 U.S. 133, 136 (1955) (recognizing that "no man is permitted to try cases where he has an interest in the outcome"); *see also Franklin v. McCaughtry*, 398 F.3d 955, 959 (2005). The general presumption is that judges are honest and impartial. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). However, this presumption can be rebutted, as *Tumey* and the cases that followed it illustrate.

*Tumey* involved a judge whose income was derived solely from the fines he recovered from convictions. The Supreme Court held that his "direct, personal, substantial, pecuniary interest" in convicting defendants was sufficient to rebut the presumption of his impartiality. *Tumey*, 273 U.S. at 523. After *Tumey*, the Court recognized other situations where bias could be presumed from a judge's pecuniary

interest in a case.[1] In *Ward v. Village of Monroeville*, 409 U.S. 57 (1972), the Court presumed bias where the judge was also the mayor and a substantial portion of the village's revenues were generated by fines from his court. 409 U.S. at 60. And in *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986), the Court held that a judge's bias could be presumed where his decision had the "immediate effect of enhancing the legal status and the settlement value" of a separate lawsuit in which he had a personal stake. 475 U.S. at 824. *Aetna Life Ins.* involved an insurance company's bad-faith refusal to pay a claim. The Alabama Supreme Court had found against the defendant insurance company—recognizing for the first time a claim for tortious injury in such circumstances—and ordered punitive damages in an amount 35 times greater than any award ever affirmed by the court. *Id.* at 823. However, the justice who cast the court's deciding vote and authored its decision was the plaintiff in a similar claim which was settled for $30,000 shortly thereafter. *Id.* at 824. The Court stated in its decision that when the justice pronounced his judgment, it was as though "he acted as a judge in his own case." *Id.* (quoting *Murchison*, 349 U.S. at 136) (internal quotes omitted).

Montgomery argues that the appearance of impropriety created when Assistant State's Attorney Arthur became angry upon discovering Judge Samuels at the June 10, 1983 meeting put the judge's job at risk. Consequently, Judge Samuels had a "personal, direct, substantial, pecuniary"

---

[1] The Supreme Court has also found that a judge's non-pecuniary interests can lead to bias. *In re Murchison* involved a judge who held two defendants in contempt and later presided over their contempt proceeding. Because the holding of *Murchison*—that a judge cannot serve as both accuser and trier of fact—is not relevant to Montgomery's claim, there is no need to discuss it in detail. 349 U.S. at 137.

interest in imposing the death penalty, as this was the only surefire way to allay Arthur's suspicions that Judge Samuels had not colluded with the defense. Montgomery claims that Judge Samuels' failure to recuse himself violated due process and should result in a new trial and sentencing, despite Montgomery's thorough admission of guilt. The Illinois Supreme Court rejected Montgomery's claim, citing state authority to the contrary. *Montgomery*, 736 N.E.2d at 1038-39. The district court agreed, concluding that Montgomery's theory of bias was too speculative to rebut the presumption that Judge Samuels was impartial. *U.S. ex rel. Montgomery v. McAdory*, No. 01 C 7486, 2003 WL 110794, at *7 (N.D. Ill. Sept. 9, 2003). Montgomery argues that the Illinois Supreme Court's decision was objectively unreasonable because it failed to address the *Tumey* line of cases.

Like the district court, we find Judge Samuels' alleged interest in convicting Montgomery and sentencing him to death to be too speculative and insubstantial to overcome the presumption of his impartiality. In *Tumey* and *Ward*, it was certain that only convictions would generate revenue; thus, the judges' bias was clear. Similarly, in *Aetna Life Ins.* it was certain that the Alabama Supreme Court justice's decision and unprecedented award of damages made success in his own contemporaneous lawsuit far more likely. By contrast, Judge Samuels' interest in Montgomery's case is attenuated and based on several, dubious assumptions. We would have to assume from Assistant State's Attorney Arthur's sudden outburst on June 10, 1983, that he actually intended to reveal the meeting to the public. That, however, is nowhere near certain; Judge Samuels himself testified that this was not the first time he had seen Arthur lose his temper. R. at 375. We would also have to assume that public disclosure of the meeting would impact Judge Samuels' career. But that, too, is highly speculative. Because both prosecutors and defense attorneys were

present throughout the meeting, there was little or no appearance of impropriety attached to it, except in Arthur's mind. Further, the Illinois Supreme Court determined that discussion at the meeting was limited to scheduling, and Montgomery has not offered clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). *Ex parte* scheduling meetings do not necessarily offend due process rights. *Drobny v. Comm'r of Internal Revenue*, 113 F.3d 670, 680 (7th Cir. 1997).

Montgomery's theory of bias more closely resembles *Bracy v. Gramley*, which the district court cited in its order. In *Bracy*, the petitioner was convicted by a judge who was later convicted of accepting bribes from defendants. The petitioner—who had not paid a bribe—claimed that the judge convicted him in order to deflect suspicion that he was soft on defendants, which might draw attention to his corrupt activities. The Supreme Court characterized this as a theory of compensatory, or camouflaging, bias. *Bracy*, 520 U.S. at 905. The Court ruled that a petitioner who proceeds with such a "speculative" theory must produce evidence that the judge "was actually biased in petitioner's own case." *Id.* at 909 (emphasis omitted). Like the petitioner in *Bracy*, Montgomery asserts that the judge sentenced him harshly to divert suspicion of impropriety. The cases are somewhat different in that, here, the claimed impropriety arose directly from Montgomery's case, whereas the corruption in *Bracy* involved cases other than the petitioner's. This distinction is not critical; Montgomery has failed to rebut the general presumption that Judge Samuels was impartial.

Because we are unpersuaded that Judge Samuels had a "direct, personal, substantial, pecuniary interest" in convicting and sentencing Montgomery to death, the decision of the Illinois Supreme Court did not constitute an unreasonable application of the rule of law set forth in the *Tumey* line of cases.

**B. Jury Waiver**

Next, Montgomery contends that his jury waivers were involuntary because he was misled by Judge Samuels about the sentence he would receive. His argument presupposes that Judge Samuels promised to sentence him to life imprisonment and later reneged. However, the Illinois Supreme Court concluded that any conversations with Judge Samuels were limited to scheduling; thus no promise was made. In so concluding, the court deferred to credibility determinations made by Judge Weber of the circuit court. Montgomery argues that the Illinois Supreme Court's decision that his waivers were knowing and voluntary was in error because it was based on the unreasonable factual determination that Judge Samuels did not promise his attorneys a life sentence. 28 U.S.C. § 2254(d)(2). To prevail on this claim, Montgomery must offer clear and convincing evidence that the Illinois Supreme Court's factual determination was wrong. 28 U.S.C. § 2254(e)(1).

Montgomery argues that it was unreasonable for the Illinois Supreme Court to credit Judge Samuels' denial that he made a promise of a life sentence over defense attorneys McNamara and Morrissey's testimony. We disagree. McNamara and Morrissey's credibility was compromised from the start because they waited four-and-a-half years before claiming that Judge Samuels had promised them a life sentence. Their credibility was further eroded by the fact that it was three more years before they produced memoranda—unsigned and undated—memorializing the alleged promise. In addition, McNamara and Morrissey gave inconsistent testimony about who was the first to tell the other about Judge Samuels' alleged promise, which is odd given how momentous that commitment would have been. R. at 847, 954. Montgomery's argument that Judge Samuels' testimony was self-interested and therefore unreliable does not constitute clear and convincing evidence that the Illinois Supreme Court's factual determination was

wrong.

Montgomery also claims that the Illinois Supreme Court's factual determination was unreasonable because McNamara and Morrissey's account was corroborated by several witnesses. The Illinois Supreme Court, however, concluded that many of these individuals lacked credibility. For example, McNamara testified that Moses Cole, Judge Samuels' clerk, told him that the judge would not impose the death penalty, but Cole died before the post-conviction hearing and records indicated that he was absent from work on the day the alleged conversation was supposed to have occurred. *Montgomery*, 736 N.E.2d at 1036; R. at 840. McNamara also stated that Shirley Thompson, Judge Samuels' court reporter, told him that the judge would not sentence anyone to death, but at the hearing she denied making that statement. *Montgomery*, 736 N.E.2d at 1036. Paul Foxgrover, a former assistant public defender, described in an affidavit conversations he had with McNamara concerning the alleged promise. However, Foxgrover was unable to testify in person because he was serving a prison sentence for felony theft. *Id.* at 1034. Morrissey offered Andrea Lyon, another former assistant public defender, to testify that he told her about Judge Samuels' alleged promise, but Judge Weber found her recollection of that conversation to be "somewhat vague" and thus lacking credibility. *Id.* at 1037. These findings by the court were reasonable, and Montgomery has failed to rebut their presumptive correctness with clear and convincing evidence to the contrary.

Still, Montgomery insists that the only reasonable explanation for his sudden decision to adopt a new trial strategy after consistently insisting on a jury trial is that Judge Samuels promised to sentence him to life imprisonment. But that is not the only reasonable explanation for his change of mind. The Illinois Supreme Court observed that Montgomery's waiver coincided with his recovery

from attempted suicide after hearing a prospective juror state that he could convict Montgomery just by looking at him. *Montgomery*, 736 N.E.2d at 1029. As the court noted, this offers another reasonable explanation for Montgomery's abrupt decision. And there remains, of course, Montgomery's detailed confession of the crimes.

In sum, Montgomery has not demonstrated that the Illinois Supreme Court's finding that Judge Samuels never promised him a life sentence was unreasonable. As a result, he is unable to show that the court erred in determining that his waiver was knowing and voluntary.

## C. Ineffective Assistance of Counsel

Finally, Montgomery argues that he was denied effective assistance of counsel when his attorneys urged him to waive his right to a jury trial and stipulate to the State's evidence in reliance upon a non-existent promise by Judge Samuels not to impose the death penalty. He contends that the Illinois Supreme Court rejected his claim by applying a rule of law contrary to *Strickland v. Washington*, 466 U.S. 668 (1984), which is the clearly established federal law on this issue. A decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the [Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

To prevail on an ineffective assistance of counsel claim, the petitioner must show that his attorneys' performance was deficient and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. To establish deficient performance under the first prong of the *Strickland* test, a petitioner must demonstrate that counsel's representation "fell below an objective standard of

reasonableness." 466 U.S. at 687-88. We assess the reasonableness of the challenged conduct "on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. There is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The Illinois Supreme Court found at least two legitimate reasons other than Judge Samuels' alleged promise that justified the defense attorneys' recommendation that Montgomery waive his right to a jury and stipulate to the State's evidence. The first reason was that the prospective juror's comment that he could convict Montgomery just by looking at him underscored the potential weakness of trying the case before a jury. *Montgomery*, 736 N.E.2d at 1038. The second was that defense attorneys McNamara and Morrissey both believed that Judge Samuels was less likely to sentence Montgomery to death than a jury. *Id.*; R. at 908, 956. We find these explanations persuasive and would add one more to the list. Defense attorney McNamara testified that although Montgomery intended to try his case in front of a jury, Montgomery "did not have a strong defense," and McNamara wanted to make certain that he saved credibility for the mitigation aspect of the case. R. at 830. The Supreme Court held in *Florida v. Nixon*, 125 S.Ct. 551 (2004), that conceding a defendant's guilt in order to save credibility for sentencing can be a reasonable trial strategy where the defendant is accused of capital murder and faces overwhelming evidence of guilt. 125 S.Ct. at 561-63. Employing that same strategy under these very similar circumstances—particularly in light of the highly incriminating admissions Montgomery made to the police—was also reasonable and did not constitute deficient performance under *Strickland*.

Montgomery contends that the Illinois Supreme Court's analysis constituted the type of *post hoc* justification that

the Court prohibited in *Wiggins v. Smith,* 539 U.S. 510 (2003). As a result, he argues that the court applied a rule of law contrary to *Strickland.* We disagree, because *Wiggins* is distinguishable. *Wiggins* involved defense attorneys who failed to investigate obviously significant mitigating evidence. The state court found that counsel had made a tactical decision to focus on their client's defense rather than on his background. The Supreme Court reversed, holding that the record contained numerous indications that counsel's failure to investigate was caused by inattention, not strategy. *Wiggins*, 539 U.S. at 526. In so ruling, the Court noted that the state court's description of counsel's strategic decision was so disconnected from the picture painted by the facts in the record that it could only be explained as a *post hoc* rationalization of counsel's conduct. *Id.* at 526-27. Here, by contrast, the Illinois Supreme Court's explanation of the defense attorneys' rationale for recommending that Montgomery waive his right to a jury and stipulate to the State's evidence was entirely reasonable and consistent with the record. *Wiggins*, therefore, is inapposite, and the Illinois Supreme Court's statement of the law under *Strickland* and application of that rule were not in error.

Since Montgomery has failed to satisfy the first prong of the *Strickland* test, it is unnecessary to address the prejudice prong.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of the writ of *habeas corpus*.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*