# Supreme Court of Texas

════════════

No. 21-0130

════════════

The State of Texas,

*Petitioner*,

v.

Volkswagen Aktiengesellschaft,

*Respondent*

════════════════════════

On Petition for Review from the
Court of Appeals for the Third District of Texas

════════════════════════

*~ consolidated with ~*

════════════

No. 21-0133

════════════

The State of Texas,

*Petitioner*,

v.

Audi Aktiengesellschaft,

*Respondent*

**PER CURIAM**

Justice Blacklock and Justice Young did not participate in this decision.

We lift the abatement order issued June 24, 2022, and reinstate these cases to our active docket.

Following the voluntary recusal of two of the Court's nine justices, the Chief Justice, pursuant to Texas Government Code Section 22.005(a), requested that the Governor of the State of Texas appoint two qualified and active appellate justices or district judges to participate in the Court's determination of these consolidated appeals. Respondents VW Germany and Audi Germany[1] objected and urged the Chief Justice to rescind the request on the basis that allowing the Governor to appoint justices in this case would create both due-process and ethical problems because the State is a party. Respondents argue that the Court should dismiss the petitions as improvidently granted if five of the seven remaining justices cannot concur on a decision, as the Texas Constitution requires. *See* TEX. CONST. art. V, § 2(a); TEX. R. APP. P. 56.1(d). For the reasons explained below, we deny Respondents' requests.

---

[1] We refer to these parties, Volkswagen Aktiengesellschaft (VW Germany) and its subsidiary Audi Aktiengesellschaft (Audi Germany), collectively as "Respondents."

## I.    Background

The Attorney General of the State of Texas, acting on behalf of the Texas Commission on Environmental Quality (TCEQ), sued two related foreign corporations—VW Germany and Audi Germany—asserting violations of Texas environmental statutes[2] in connection with an alleged vehicle-emissions cheating scandal that has come to be referred to as "dieselgate." Respondents filed special appearances challenging Texas courts' authority to exercise personal jurisdiction over them. The trial court concluded Respondents are subject to personal jurisdiction in Texas, and Respondents appealed. A divided court of appeals reversed and dismissed the State's claims. ___ S.W.3d ___, 2020 WL 7640037 (Tex. App.—Austin Dec. 22, 2020). The State sought review, and this Court granted both petitions and consolidated them for oral argument, which was heard on February 22, 2022. While the cases have been pending, two of the Court's nine justices recused sua sponte. The Court abated the cases on June 24, and the Chief Justice, relying on Section 22.005 of the Government Code, requested by letter that the Governor "commission two persons with the qualifications prescribed for Justices of the Supreme Court, each either an active appellate court justice or active district court judge, to participate in the deliberation and determination of these cases." By letter dated August 25, 2022,

---

[2] The Texas Water Code requires that such cases be brought by the Attorney General in the name of the State of Texas. *See* TEX. WATER CODE § 7.105(a).

3

Governor Abbott responded, appointing two active appellate court justices to participate in the Court's determination of the cases.[3]

Respondents submitted letters to the Court on June 29 and July 13, 2022, objecting to the Governor's appointment of the two substitute justices. They correctly point out that Section 22.005(a) is not mandatory but, rather, vests the Chief Justice with discretion to request appointment of justices under these circumstances. And they argue the Chief Justice should rescind his request because employing the statutory process here would violate the principle that "no one may be the judge in his or her own cause." Respondents advance various theories in support of this core complaint. Although they acknowledge the Governor, the Attorney General, and TCEQ (the client-agency in this case) are different actors, Respondents urge us to treat them—and the commissioned substitute justices—as if they were all one, contending that employing the Section 22.005 certification process "would effectively allow the State to be the judge of its own cause." Next, relying on *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), they argue that even if the Governor is not technically a named party, he "has the kind of stake in these cases" that would violate constitutional guarantees of due process and due course of law if he were to commission justices under Section 22.005(b). Third, they contend any justice appointed in this case would be required to recuse under Texas's procedural rules and ethical canons. Respondents proclaim there is but

---

[3] The two appointed justices are Chief Justice Bonnie Sudderth of the Second Court of Appeals and Justice Jaime Tijerina of the Thirteenth Court of Appeals. Neither participated in this decision regarding Respondents' objections to their appointment.

4

one path forward if five of the seven remaining justices cannot concur on a decision as required by our Constitution: to dismiss the petitions as improvidently granted under Rule of Appellate Procedure 56.1(d), leaving the jurisdictional question the cases present to be resolved in a future case.

## II.    Governing Law

The United States Constitution guarantees that a state shall not deprive any person of life, liberty, or property without due process of law.  U.S. CONST. amend. XIV, § 1.  The Texas Constitution includes a similar but not identical guarantee.  *See* TEX. CONST. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.").  A fair trial in a fair tribunal is a basic requirement of due process.  *In re Murchison*, 349 U.S. 133, 136 (1955).  A fair tribunal, in turn, requires a neutral and detached hearing body or officer.  *See Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)).  "The due process clause entitles a person to neutrality in adjudicative proceedings in both civil and criminal cases.  This neutrality helps to guarantee 'that life, liberty, or property will not be taken'" in error "while preserving 'both the appearance and reality of fairness.'"  *Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 844 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (citation omitted) (quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980)).  "To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome." *Id.* (quoting *In re Murchison*, 349 U.S. at 136).  But that interest cannot

5

be defined with precision; "[c]ircumstances and relationships must be considered." *In re Murchison*, 349 U.S. at 136.

While these constitutional guarantees protect the state's strong interest in judicial integrity, they rarely are implicated in disputes regarding judicial disqualification and recusal. *See FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948) ("[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level." (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927))). "[O]nly in extreme cases would disqualification on the basis of bias and prejudice be constitutionally required." *Texaco*, 729 S.W.2d at 844 (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986)). Allegations of bias and prejudice typically are not enough to sustain claims that constitutional due-process rights have been violated. *See Aetna*, 475 U.S. at 821. Rather, the judge or justice must have "a more direct stake in the outcome" of the case. *See id.*

A further reason that constitutional guarantees are only rarely implicated in disputes regarding judicial disqualification and recusal is that Congress and the states, by legislation and rule, have imposed more rigorous protections of judicial integrity than our Constitutions mandate. The result is that most cases involving questions of judicial disqualification and recusal are determined under nonconstitutional standards. *Tumey* recognized this:

> All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion.

273 U.S. at 523 (citing *Wheeling v. Black*, 25 W. Va. 266, 270 (1884)).

Indeed, the Supreme Court of the United States has recognized only three situations in which the Due Process Clause requires disqualification:

(1)    when the judge has a financial interest in the outcome of the case, *see id.* (judges may not preside over cases in which they have a "direct, personal, substantial pecuniary interest");

(2)    when the judge seeks to preside over a contempt proceeding against a witness who testified in secret before the judge, *see In re Murchison*, 349 U.S. at 137 (a judge may not act as a grand jury and then adjudicate contempt charges against "the very persons accused as a result of his investigations"); and

(3)    when "a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." *Caperton*, 556 U.S. at 884.

Outside of these situations, determinations whether disqualification or recusal is required are made by reference to the Texas Code of Judicial Conduct, the Texas Rules of Appellate Procedure, and the Texas Rules of Civil Procedure.

The grounds for disqualification and recusal under Texas law are set out in Rule of Civil Procedure 18b. Relevant to this case, Rule 18b requires a judge to recuse if "the judge's impartiality might reasonably be questioned" or "the judge has a personal bias or prejudice concerning the subject matter or a party." TEX. R. CIV. P. 18b(b)(1), (2); *see* TEX. R. APP. P. 16.2 ("The grounds for recusal of an appellate court justice or judge are the same as those provided in the Rules of Civil Procedure."). Canons 2 and 3 of the Code of Judicial Conduct address these same

7

issues.  Titled "Avoiding Impropriety and the Appearance of Impropriety in All of the Judge's Activities," Canon 2 requires that "[a] judge shall not allow any relationship to influence judicial conduct or judgment." TEX. CODE JUD. CONDUCT, Canon 2(B).  Similarly, Canon 3 requires a judge to "perform judicial duties without bias or prejudice." *Id.* Canon 3(B)(5).  Notably, the Rules and Canons do not concern themselves merely with mandating disqualification or recusal where appropriate; Canon 3(B)(1) also *prohibits* unnecessary disqualifications and recusals by mandating that judges "shall hear and decide matters assigned . . . *except* those in which disqualification is required or recusal is appropriate."  *Id.* Canon 3(B)(1) (emphasis added).  This prohibition reflects a recognition that a too-casual approach to disqualification or recusal would threaten to frustrate our judicial system.

Where, as here, a justice has determined that recusal is appropriate, Government Code Section 22.005 sets forth a process by which substitute justices may be commissioned to participate in the Court's determination of a case.  It states that "when one or more justices of the supreme court have recused themselves . . . or are disqualified . . . to hear and determine a case in the court," the "chief justice may certify" that fact to the Governor.  TEX. GOV'T CODE § 22.005(a).  In that event, Section 22.005(b) mandates that the Governor "immediately shall commission the requisite number of persons who are active appellate or district court justices or judges and who possess the qualifications prescribed for justices of the supreme court to try and determine the case."  *Id.* § 22.005(b).  This statutory commissioning power is derived from the Texas Constitution, which has

8

required since 1876 that when any member of the Court is "disqualified to hear and determine any case or cases in said court, the same shall be certified to the Governor of the State, who shall immediately commission" a substitute justice. TEX. CONST. art. V, § 11.

Our Constitution also authorizes the Governor to appoint judges when "[a] vacancy in the office of Chief Justice, Justice, or Judge of the Supreme Court, the Court of Criminal Appeals, the Court of Appeals, or the District Courts" arises, usually due to death or retirement. *Id.* art. V, § 28(a). Because Texas has more than 500 justices and district court judges, the Governor is called upon to exercise this constitutional appointment power on a routine basis. *See News – Appointment,* OFF. TEX. GOVERNOR, https://gov.texas.gov/news/category/appointment (last visited Nov. 10, 2022) (reflecting the Governor has appointed more than ten justices and judges so far this calendar year). Regardless of the circumstances giving rise to the need for a judicial appointment, Texas justices and judges are presumed to act impartially. *See Rodriguez v. State*, 491 S.W.3d 18, 33 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (citing *Brumit*, 206 S.W.3d at 645) (requiring "a clear showing of bias" to rebut the presumption of a judge's impartiality); *see also Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (stating that there is a "presumption of honesty and integrity in those serving as adjudicators"). And they are bound by the same ethical rules regarding disqualification and recusal, regardless of whether they took office by means of election or appointment.

9

## III.    Discussion

## A.    Commissioning justices does not amount to allowing the State to "be the judge of its own cause"

Respondents argue that allowing the Governor to commission two justices to participate in the Court's determination of these cases is tantamount to allowing the State "to be the judge of its own cause" and "would create an appearance of partiality that the Court should avoid at all costs."  Respondents' argument rests on two fallacies: (1) that the Governor is the State and thus effectively a party in these cases, even if not named as such; and (2) that commissioned justices, by virtue of having been appointed by the Governor, must be partial to the State or, at a minimum, will necessarily appear to an ordinary person to be partial to the State.

The claim that the Governor's commissioning of temporary justices would be attributable to the State, the named plaintiff, misunderstands the nature and structure of Texas's government.  As Respondents concede in their July 13 letter, "Texas does not have a unitary executive."  *See In re Abbott*, 645 S.W.3d 276, 280 (Tex. 2022) ("[T]he Texas Constitution does not vest the executive power solely in one chief executive.  Instead, the executive power is spread across several distinct elected offices . . . .").

In Texas, it is not the Governor but the Attorney General, a distinct and separately elected officer, who has authority to initiate and conduct enforcement actions on the State's behalf.  *See* TEX. CONST. art. IV, §§ 1, 2, 22; *In re Abbott*, 645 S.W.3d at 283-84 (holding that "the Governor lacks the authority to investigate or prosecute" a state agency's enforcement actions).  Consistent with the Texas Constitution,

10

the enforcement actions here were brought *not* by the Governor but by the Attorney General, as authorized by the Water and Government Codes. *See* TEX. WATER CODE § 7.105(b) (requiring TCEQ to refer certain environmental violations to the Attorney General for enforcement);[4] TEX. GOV'T CODE § 402.021 (establishing the Attorney General's duty to "prosecute and defend all actions in which the state is interested before the supreme court and courts of appeals"). Because these actions were not brought by the Governor, at his direction, or on his authority, we do not impute the status of party to the Governor himself. The State acts through its officers, to be sure, but the Governor is not automatically implicated in every state action or even every executive-branch action.

Our cases acknowledge the separateness of a government entity and its constituent government actors. In *Abbott v. Mexican American Legislative Caucus*, this Court considered the distinction between the State and the Governor for purposes of identifying the proper defendant. 647 S.W.3d 681, 698 (Tex. 2022) ("[C]laims . . . may be brought against the *relevant* governmental entity." (emphasis added)). We determined that the State was not the proper defendant for one of the plaintiffs' claims, whereas the Governor or the Secretary of State may have been. *Id.* at 698, 704. In short, actors within the executive branch, be they individuals or entities, are not interchangeable and cannot be considered alter egos of one another. For this reason, the fact that these

---

[4] Though the Attorney General acts on behalf of TCEQ in bringing such enforcement actions, the Water Code requires that such actions be brought "in the name of the state." TEX. WATER CODE § 7.105(a).

11

enforcement actions were brought by the Attorney General on behalf of and at the request of TCEQ is insufficient to impute party status to the Governor.

Nor does the Governor's authority to appoint TCEQ commissioners or officers justify imputing party status to him. Though the Legislature creates agencies within the executive department, their "animating statutes do not subject their decisions to the Governor's direct control," and where the Governor has the authority to appoint agency officers, the "enabling statutes rarely give the Governor formal control over the officers' decisions once appointed." *See In re Abbott*, 645 S.W.3d at 280 & n.1. TCEQ's enabling statute is structured in this way. *See* TEX. WATER CODE § 5.052(a) ("The commission is composed of three members who are appointed by the governor with the advice and consent of the senate to represent the general public."); *id.* § 5.126 (requiring TCEQ to report its enforcement actions to the Governor, Lieutenant Governor, and Speaker of the House of Representatives); *id.* § 5.178 (requiring TCEQ to prepare and file biennial reports of its activities to the Governor and the Legislature). The Governor may appoint TCEQ commissioners and receive reports on its activities, but nothing in TCEQ's enabling statute gives him the authority to direct their actions.

Respondents claim the Governor has a direct interest in this lawsuit because it will potentially increase the state's general fund. But the Governor, of course, holds no pecuniary interest in the general fund. And Respondents overstate the extent of his control over the state's appropriations and budgeting decisions. The appropriation of the state budget, including the general revenue fund, lies within the power of the

12

legislative department. *See* TEX. CONST. art. III, §§ 5(b), 35 (recognizing the Legislature's authority to act on appropriations and to pass a general appropriations bill); TEX. GOV'T CODE §§ 316.021, .022 (requiring the Legislature to consider and approve general appropriations bills); *id.* § 322.008 (requiring the Legislative Budget Board to prepare the general appropriations bill for approval by the Legislature). The Governor is involved in the budget process, to be sure. He may prepare a budget for the Legislature's consideration. *See id.* §§ 401.0445, .046. And he consults with the Legislative Budget Board to adopt achievement goals for the government. *See id.* § 2056.006. His biennial budget, which he delivers to the Legislature, is often used as a "guiding policy statement." SENATE RESEARCH CENTER, BUDGET 101: A GUIDE TO THE BUDGET PROCESS 12 (2007). But the Governor's policy guidance ultimately is advisory; it does not supplant the Legislature's ultimate authority to consider, negotiate, and approve or deny the general appropriations bill. In sum, the Governor's status as the elected officer that leads the executive branch does not justify imputing other state actors' conduct or party status to him.

Respondents' claim that the Governor's commission of substitute justices under Section 22.005 amounts to allowing "the State to be the judge of its own cause" fails for another reason. A judge appointed by the Governor does not, by virtue of his or her appointment, become *the State's* judge. By this, we mean that the mere fact of being appointed does not taint a judge with partiality in the State's favor. It does not support the assertion, pressed heavily by Respondents, that commissioned justices—whether appointed temporarily for

13

participation in one case or to complete an unexpired term prior to a general election—will necessarily seek to advance the State's interests in the cases that come before them. Indeed, the very nature of an independent judiciary requires that judges act neutrally and *not* seek to further one party's interests. *See Rodriguez*, 491 S.W.3d at 33 (citing *Brumit*, 206 S.W.3d at 645) (judges are presumed to act impartially). Respondents' complaint that a commissioned justice would be acting as "the State" in the State's cause is at odds with the very nature of judging.

**B.      This case is not like *Caperton* or any other case requiring disqualification or recusal**

Respondents next contend that the Governor is constitutionally prohibited from commissioning justices to hear these cases. They rely heavily on *Caperton*, asserting that even if the Governor is not actually a party, he has a "personal stake" in the case such that his appointment of two substitute justices to participate in the determination of these cases would violate due process. Notably, Respondents do not complain that either of the two commissioned justices has a personal bias or individual circumstance that requires disqualification or recusal; indeed, Respondents objected to their appointment before their identities were known. Respondents instead contend that the *Governor's* role in the Section 22.005 process taints *every* justice or judge who could be appointed. In their view, the Governor's appointment of any justice is constitutionally intolerable.

*Caperton* is the centerpiece of Respondents' argument, and a recitation of its "extraordinary" and "extreme" facts demonstrates it does not control this case. *See* 556 U.S. at 887. Hugh Caperton had obtained a $50 million judgment against A.T. Massey Coal in West

14

Virginia state court. *Id.* at 872. After Massey appealed, Caperton challenged one justice's participation in the case on the grounds that Massey's president, chairman, and chief executive officer, Don Blankenship, contributed $3 million to benefit the justice's judicial campaign while the appeal was pending. *Id.* at 873. The candidate won the election—becoming Justice Benjamin—and participated in the decision of the case over Caperton's objection. *Id.* at 873-74. Justice Benjamin denied Caperton's motion to disqualify and voted with the three-justice majority, which reversed the judgment against Massey. *Id.* at 874.

The case took strange turns on rehearing. Photos surfaced of one justice "vacationing with Blankenship in the French Riviera," leading that justice to recuse. *Id.* at 874. Yet another justice recused on Massey's motion, based on his public criticism of Blankenship's role in the election. *Id.* at 874-75. But Justice Benjamin again denied a motion seeking his disqualification, despite the urging of a recused justice, who noted that "Blankenship's bestowal of his personal wealth, political tactics, and 'friendship' have created a cancer in the affairs of th[e court]." *Id.* at 875 (internal quotation marks omitted). Justice Benjamin then became the acting chief justice responsible for selecting two substitute justices to replace the two who recused. *Id.* Caperton again objected, but Justice Benjamin denied the motion anew, and the newly comprised court again reversed the judgment against Massey. *Id.*

The United States Supreme Court granted certiorari and held that due process requires recusal when a "person with a personal stake in a particular case ha[s] a significant and disproportionate influence in

placing the judge on the case by raising funds . . . when the case [is] pending or imminent" and the result is that, in effect, "a man chooses the judge in his own cause." *Id.* at 884, 886. Blankenship held a personal financial interest in the outcome of the case and had disproportionate influence in securing Justice Benjamin's election to the court. *See id.* at 884. Justice Benjamin, in turn, obtained a multi-million-dollar benefit from Blankenship but nevertheless participated in the decision of the case over Caperton's repeated objections and then proceeded to exercise the appointment power to choose two other judges. *See id.* at 873, 875. The Court concluded these circumstances created "a serious, objective risk of actual bias" sufficient to require Justice Benjamin's recusal whether or not actual bias exists or can be proved. *Id.* at 886. Yet it noted the unlikelihood that such a fact pattern would arise again, dismissing the dissent's concerns that its decision would result in "a flood of recusal motions" or "unnecessary interference with judicial elections" because the facts were "extreme by any measure." *Id.* at 887.

*Caperton* is different from this case in meaningful respects. First, the Governor has constitutional and statutory duties to appoint justices and judges. Tex. Const. art. V, §§ 11, 28(a); Tex. Gov't Code §§ 22.005(b), .217(b). Blankenship, by contrast, was under no duty to support Justice Benjamin's campaign. His participation in assisting Justice Benjamin in winning election to the West Virginia court was voluntary. In the Court's view, Blankenship's participation reasonably could be perceived as having been *motivated* by his personal financial

16

interest in having the Massey judgment reversed.  *See Caperton*, 556 U.S. at 886.

Second, analogizing the Governor to Blankenship does not work because, unlike in *Caperton*, the Governor does not confer on the commissioned justices anything of pecuniary value.  The commissioned justices do not receive more pay for having been commissioned, and, on the other side of the coin, commissioning these justices requires no financial outlay by the Governor.  There is no basis for imagining a quid pro quo exists between them.  Blankenship made a multi-million-dollar outlay for Justice Benjamin's benefit and vacationed with another justice while Massey's appeal was pending. *Id.* at 873-74.

Third, unlike in *Caperton*, the factors weighing against requiring recusal here carry vast significance for our judicial system itself.  In *Caperton*, Justice Benjamin's recusal would have had no ill effect on the judicial system.  Had he recused, another justice could have served in his stead.  Massey would not have lost its right to appeal, only its desire to have it determined by Blankenship's preferred justices.  Here, by contrast, adopting Respondents' theory would hinder the normal operation of Texas's highest civil court.  If *no* substitute judge or justice could ethically participate in the decision of these cases and the remaining justices could not reach a five-justice consensus, the Court would have no choice but to raise a white flag and dismiss the State's appeal without reaching its merits.  Neither the due-process guarantee nor our ethical rules contemplate that their application would bring the courts to such a grinding halt.  *See Cameron v. Greenhill*, 582 S.W.2d 775, 776 (Tex. 1979) ("The Constitution does not contemplate that

17

judicial machinery shall stop. If this is threatened, the doctrine of necessity will permit the judge to serve." (citing *Hidalgo Cnty. Water Control & Improvement Dist. No. 1 v. Boysen*, 354 S.W.2d 420, 423 (Tex. App.—San Antonio 1962, writ ref'd))).

Nor is this case like the others in which the United States Supreme Court has held due process requires disqualification. *Tumey*, on which *Caperton* relies, involved a city mayor who himself acted as the judge in cases in which he stood to receive a personal financial benefit if he obtained a conviction. *See Tumey*, 273 U.S. at 520. Here, by contrast, the Governor has not commissioned *himself* to serve as a justice in these cases. Likewise, the substitute justices have no financial incentive to favor one side over the other.

*Aetna Life Insurance Co. v. Lavoie* likewise illustrates that mere allegations of bias and prejudice of the type alleged here are insufficient to create a constitutional due-process violation. *See* 475 U.S. at 821. Aetna claimed a state supreme court justice, Justice Embry, was biased against it because Justice Embry had brought a pending class action against insurers, the outcome of which would be affected by the court's decision in Aetna's case. *Id.* at 817. Yet Justice Embry authored the per curiam opinion that had the "immediate effect of enhancing both the legal status and the settlement value of his own case." *Id.* at 818, 824. The existence of this concrete, personal, pecuniary interest led the Court to conclude that Justice Embry had impermissibly "acted 'as a judge in his own case.'" *See id.* at 824 (quoting *In re Murchison*, 349 U.S. at 136). Here, Respondents can point to no such personal, pecuniary interest that would justify disqualifying the entire Texas judiciary.

*Aetna*'s treatment of justices other than Justice Embry is likewise instructive. The Court refused to disqualify the other justices despite Aetna's assertion that they were potential class members in Justice Embry's suit. *Id.* at 825. The Court concluded that any purported interest other justices might have was too slight and indirect and, importantly here, doing so on such a slight basis "might require the disqualification of every judge in the State." *Id.* (noting that if circumstances did require all justices to recuse, a "rule of necessity" might apply so that "none of the judges or justices would be disqualified").

*Aetna* is thus instructive on several fronts. First, mere allegations of bias and prejudice are generally insufficient to establish a constitutional violation; a violation is likely only to occur where there are extreme facts giving rise to a "direct, personal, substantial, pecuniary interest" in the case. *See id.* at 821-22 (quoting *Tumey*, 273 U.S. at 523)). Second, a pecuniary interest must be direct, rather than speculative and contingent, to raise constitutional concerns. *See id.* at 826. Third, the Court recognized the rule of necessity permits judges to hear cases in which they might otherwise be recused if the case cannot be heard otherwise. *See id.* at 825 (citing *United States v. Will*, 449 U.S. 200, 214 (1980) (allowing federal judges to participate in hearing a matter in which all Article III judges had a pecuniary interest)).

Texas courts have similarly concluded that a single campaign contribution to a judge, in the absence of other compounding factors, does not present an "appearance of bias and prejudice" that would rise to the level of a constitutional violation. *See Texaco*, 729 S.W.2d at

844-45. In that case, Texaco argued that disqualification of a judge who had received a campaign contribution from a lawyer participating in the case was required by *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968). *Texaco*, 729 S.W.2d at 844. The court of appeals distinguished *Commonwealth* on the basis that it involved the appeal of an arbitration award in which one of the arbitrators had an ongoing, sporadic business relationship with one of the parties, including "*the rendering of services on the very projects involved in the lawsuit.*" *Texaco*, 729 S.W.2d at 845. In contrast, the trial judge in *Texaco* had "neither participated with Pennzoil in the case being tried nor enjoyed even 'the slightest pecuniary interest' in the outcome of the trial." *Id.* (quoting *Tumey*, 273 U.S. at 524). So too here. Because the commissioned justices do not enjoy even the slightest pecuniary interest in this case's outcome, their participation raises no constitutional concerns.

**C.  Ethical standards do not require per se disqualification of every justice or judge commissioned pursuant to Section 22.005**

Respondents also assert that the Governor should not commission substitute justices because commissioning *any* justice or judge pursuant to Section 22.005 would create an appearance of impropriety in the mind of an ordinary person. The argument ignores a fundamental legal principle—justices and judges are presumed to act impartially and honestly. *See Rodriguez*, 491 S.W.3d at 33 (citing *Brumit*, 206 S.W.3d at 645) (requiring clear showing of individual judge's bias to rebut presumption of impartiality); *see also Withrow*, 421 U.S. at 47. Respondents' theory turns the presumption upside-down: in their view,

a reasonable person would necessarily look askance at even the noblest of judges with unquestionable ethics if they were commissioned to serve in these cases.

Yet, even leaving the presumption aside, we are not convinced that a justice's acceptance of the Governor's appointment to participate in the determination of these cases would create in reasonable minds a perception that the justice is unable to carry out his or her responsibilities with integrity, impartiality, and competence. The commissioning statute requires that a temporary justice be selected from among the state's "active appellate or district court justices or judges." TEX. GOV'T CODE § 22.005(b). The eligible justices and judges routinely—and ethically—decide cases in which the State, the Governor, or other state officials are parties. We trust they could meet those same ethical obligations in these cases.

In short, we do not agree that the mere fact of the Governor's selection of justices or judges to participate in a particular case would necessarily create in reasonable minds a perception that these justices or judges would be unable to carry out their responsibilities with integrity, impartiality, and competence; otherwise, every eligible justice or judge would necessarily be disqualified. In these cases, as in all other cases, whether to recuse must be a decision for the commissioned justice or judge in the first instance. *See* TEX. R. CIV. P. 18b.

## IV. Conclusion

The Governor's appointment of two substitute justices to participate in the determination of these cases does not, in and of itself, create a serious risk of actual bias under *Caperton* and therefore does

21

not violate the due-process or due-course-of-law provisions. Nor does it, standing alone, taint the commissioned justices with the appearance of partiality or impropriety under Texas ethical rules. We therefore deny Respondents' requests to withdraw the Chief Justice's certification letter and to dismiss the petitions as improvidently granted.

**OPINION DELIVERED:** November 18, 2022