

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. WR-77,175-05

**Ex Parte RANDY ETHAN HALPRIN, Applicant**

## ON APPLICATION FOR WRIT OF HABEAS CORPUS
### CAUSE NO. W01-00327-T(B) IN THE 283ʀᴅ JUDICIAL DISTRICT COURT DALLAS COUNTY

**KELLER, P.J., filed a dissenting opinion in which KEEL and SLAUGHTER, JJ., joined..**

## DISSENTING OPINION

The Court misunderstands the law regarding disqualification of a judge for bias. It grants Applicant relief on the basis of the trial judge's personal views and out-of-court comments about Applicant's religion. But under Supreme Court precedent, in order for a judge who holds derogatory views about a defendant's religion to be disqualified, there must be a showing that the judge's *conduct in the criminal proceedings* was influenced by his derogatory views. What a judge *does* can violate the Constitution. What he *thinks* cannot. Nothing in the record on habeas or at trial shows, or even suggests, that the trial judge's views influenced how he conducted the criminal proceedings

in this case.

## I. BACKGROUND

The Court's rendition of the testimony of Applicant's witnesses is accurate as far as it goes. But the Court leaves out any reference to the State's witnesses. One of those witnesses, Randall Isenberg, a Jewish attorney who was a close friend and colleague of Judge Cunningham's, testified that Judge Cunningham did not harbor anti-Semitic views and that Isenberg would not be friends with someone who did.[1] The habeas court found Isenberg to be *not* credible, and if we defer to that determination, then it would be valid to disregard his testimony. But the Court rejects all of the habeas court's findings and, as the Court acknowledges, there is reason to approach some of the testimony given by Applicant's witnesses with a "healthy dose of skepticism." It is also not accurate for the Court to say that the testimony of Applicant's witnesses was "uncontradicted," since Isenberg's testimony contradicts the notion that Judge Cunningham harbors any anti-Semitic bias. Isenberg's testimony seems manifestly credible, and if one believed it, one could in turn disbelieve most of the testimony of Applicant's witnesses, for the reasons that give rise to the Court's "healthy dose of skepticism."[2] But, unlike the Court, I will assume that the habeas court was within its

---

[1] Isenberg testified to numerous social interactions with Judge Cunningham, including Judge Cunningham participating in Passover services at Isenberg's house and attending and wearing a yarmulke at Isenberg's two daughters' bat mitzvahs.

[2] Two members of Judge Cunningham's family are estranged from him. A brother was involved in a bitter intra-family lawsuit with the judge, and Isenberg testified that his opinion of the brother's veracity was "bad." Another witness against Judge Cunningham acknowledged that the estranged brother was probably her closest friend. Another non-relative faulted the judge for representing one of her siblings against another in a lawsuit, saying that she "didn't like that at all" and that the judge "had no business in our business." She also admitted that she said in a Facebook post that she had "an axe to grind against" the judge.

Judge Cunningham had a trust for his children that conditioned distribution of benefits on marriage to a white Christian of the opposite sex. There was also testimony that Judge Cunningham

discretion to disbelieve Isenberg. I will therefore defer to the habeas court's credibility findings, and I will dispense with any further discussion of his testimony.

But the habeas court found two of the State's witnesses to be *credible*. These were one of Applicant's trial attorneys (Edwin King) and a bailiff. Both were present for many trials conducted by Judge Cunningham, including Applicant's. Both testified that they never saw any sign of bias by Judge Cunningham in the courtroom.

Specifically, King testified that, "[I]n all my years of practice, I've never known Vickers Cunningham to rule in a manner that was based, in my opinion, on race, creed or color, either as a sitting county criminal court judge, or as a district court judge." King explained that he would have filed a motion to recuse if he had seen something suggesting prejudice based on race or religion:

> Q. Since Defense counsel asked you about Mr. Halprin's trial, if you had seen anything during that trial that indicated to you that Judge Cunningham was biased against your client based on race, religion or creed, would you have hesitated to file whatever appropriate motion you thought you needed to?
>
> A. No, I would not have hesitated.

Similarly, the bailiff testified that he had not seen Judge Cunningham treat anyone differently based on race or religion:

> Q. And during that entire time, did you ever ha[ve] an occasion to see Judge Cunningham treat anybody differently based on race, religion or creed or nationality?
>
> A. No, sir.
>
> Q. Treated everybody equally the same?
>
> A. Yes.

---

wanted his children not to marry outside the Christian religion. But wanting one's children to marry within a particular religion is not itself anti-Semitic.

The bailiff said that he was present for all of the Texas Seven trials that Judge Cunningham presided over and that, in the course of his career as a bailiff, he did not see anything to indicate that Judge Cunningham treated anyone differently based on race, religion, or creed.

The habeas court believed that the trial attorney and the bailiff did not observe any bias from Judge Cunningham from the bench, but nevertheless discounted their testimony. It found King's testimony to have "little probative value" because he lacked the training or skills to reliably discern whether Judge Cunningham was acting from bias. The habeas court found the bailiff's testimony to have "no probative value" because the bailiff did not consider whether Judge Cunningham was making biased decisions and because he lacked the responsibility, training, or knowledge to identify signs of bias.

Giving deference to the habeas court, I will assume that the testimony of these two witnesses does not rebut the claim that Judge Cunningham held anti-Semitic views. But as I will explain later, this testimony supports a conclusion that any such views did not influence his decisions or his demeanor before the jury.

## II. ANALYSIS

### A. The Law of Bias Under the Due Process Clause

The Supreme Court has identified three types of "bias": (1) actual bias, (2) inferred bias based on interest, and (3) personal bias. As I shall discuss below, only the first two of these types of bias can cause a due-process violation. The Supreme Court has *never* found a due-process violation as a result of a judge having a personal bias adverse to a defendant.

### 1. *Actual Bias*

"Due process guarantees an absence of actual bias on the part of the judge."[3]  Actual bias, if disclosed, would "no doubt" be grounds for relief.[4]  Because actual bias can be difficult to ascertain, the Supreme Court's precedents focus mainly on inferred bias, applying an objective standard that, in the usual case, avoids having to determine whether the judge is actually biased.[5]  Actual bias can be defined indirectly, by looking at the definition of inferred bias.  I address inferred bias in more detail in the next paragraph, but suffice it to say, inferred bias involves the temptation, because of a financial interest or a conflict of interest, to not hold the balance nice, clear, and true[6]—or more simply, the temptation to act in a manner that is not neutral with respect to the parties.[7]  With inferred bias involving a *temptation* to not act neutrally, actual bias would involve a judge actually acting in a non-neutral fashion.  The Court finds that Judge Cunningham exhibited actual bias against Applicant.

## 2. *Inferred Bias*

For the second type of bias–inferred bias–the "temptation" at issue is narrow.  It is based not on personal viewpoint, but on an objectively determinable *interest*.  Critically, the Supreme Court

---

[3]  *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (internal quotation marks omitted, quoting from *In re Murchison*, 349 U. S. 133, 136 (1955)).

[4]  *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868, 883 (2009).

[5]  *Williams*, 579 U.S. at 8.

[6]  *Caperton*, 556 U.S. at 878; *Tumey v. Ohio*, 273 U.S. 510, 532 (1927).  *See also Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986).

[7]   *Williams*, 579 U.S. at 8 (whether "the average judge in his position is 'likely to be neutral, or whether there is an unconstitutional 'potential for bias.'").  *See also Isom v. Arkansas*, 140 S. Ct. 342, 344 (2019) (Sotomayer, J., concurring) (referring to the Due Process Clause's guarantee of a "neutral decisionmaker").

has identified only two types of interest that can establish inferred bias: financial interest and conflict of interest.[8] Disqualifying interests include the judge being directly compensated out of a fine or costs assessed against a defendant,[9] a disproportionately large campaign contribution by a party in a pending case to a person seeking election to the court that would hear the case,[10] and a judge sitting on a case in which he previously made a critical decision as a prosecutor.[11] Where a disqualifying interest is involved, due process "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties."[12] Even if no evidence shows that the judge unfairly tilted the playing field against the defendant, there is a fear that the judge did tilt the playing field based on his financial interest in the outcome of the case or his relationship to a party in the case that causes a conflict of interest.

### 3. *Personal Bias*

---

[8] *Williams*, *supra* at 35 ("Traditionally, judges disqualified themselves when they had a direct and substantial pecuniary interest or when they served as counsel in the same case."); *Caperton*, 556 U.S. at 877-81 (discussing "two instances where the Court has required recusal" under due process). Judge Yeary believes that the Supreme Court created a new basis for granting due process relief in *Caperton*, the only limiting principle of which is the existence of "an extraordinary situation," that is "confined to rare instances." But in *Caperton*, the Supreme Court itself said, "In this case we do nothing more than what the Court has done before." 556 U.S. at 888. Contrary to Judge Yeary's understanding of *Caperton*, the Supreme Court did not create a broad new amorphous standard that upends traditional standards for disqualification. It merely broadened the definition of "financial interest." *See id.* at 882, 884.

[9] *Tumey*, 273 U.S. at 523.

[10] *Caperton*, 556 U.S. at 884.

[11] *Williams*, 579 U.S. at 9.

[12] *Lavoie*, 475 U.S. at 825 (quoting from *Murchison*, 349 U. S. at 136).

I now come to the third type of bias—personal bias, which is primarily the type of bias alleged by Applicant in this case. Under the traditional common-law rule, "disqualification for bias or prejudice was not permitted."[13]

> The common law disqualification of judges was clear and simple: a judge was disqualified for direct pecuniary interest and for nothing else . . . Blackstone rejected absolutely the possibility that a judge might be disqualified for bias as distinguished from interest . . . In short, English common law practice at the time of the establishment of the American court system was simple in the extreme. Judges disqualified for financial interest. No other qualifications were permitted.[14]

Blackstone explained that the personal views of a judge did not matter because "the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea."[15] Consistent with the common law rule, this Court explained before the advent of our own recusal rules that personal bias would not disqualify a judge and that a complaint could be made only of a judge's conduct or rulings:

> Prejudice of a trial judge not based on interest is not a legal disqualification. If prejudice or opinion of guilt is indicated or shown the judge's rulings are subject to close scrutiny. The right to complain lies not in the alleged prejudice of the judge but in any errors in his rulings and conduct of the trial.[16]

Although statutes and ethical canons have modified that common law principle to require a judge to recuse himself when he has a personal bias or prejudice concerning a party, the Supreme Court

---

[13] *Id.* at 820.

[14] *State ex rel. Millsap v. Lozano*, 692 S.W.2d 470, 474 (Tex. Crim. App. 1985) (quoting Interpretive Commentary, TEX. CONST., Art. V, § 11) (ellipses in *Lozano*).

[15] *Lavoie*, 475 U.S. at 820 (quoting 3 W. Blackstone, Commentaries *361).

[16] *Minor v. State*, 469 S.W.2d 579, 580 (Tex. Crim. App. 1971).

has held that that alone does not give rise to a constitutional requirement.[17]  It is true that in denying

relief on a claim of judicial bias, the Supreme Court once said that, "only in the most extreme of

cases" would disqualification be constitutionally required due to a judge's personal views.  But not

only was that remark *dicta*, the Supreme Court has never before that comment and never in the

thirty-eight years since that comment held an allegation of personal bias or prejudice to be sufficient

to show a violation of the Due Process Clause.[18]

### B. Habeas Court's "Inferred Bias" Conclusion Flawed

The habeas court concluded that Judge Cunningham's anti-Semitic views gave rise to a

temptation to not hold the balance fair and true and that the judge's anti-Semitic prejudices created

an objectively intolerable risk of bias.  In doing so, the habeas court used the standard for inferred

bias.  But the habeas court was mistaken to conclude that inferred bias can arise from a judge's

negative personal views about classes of people.  It cannot.

As I explained above, inferred bias must be based on interest,[19] and the interest at issue must

be either a financial interest[20] or a conflict of interest.[21]  The Supreme Court has never held that a

---

[17]  *Lavoie*, 475 U.S. at 820.

[18]  *Id.* at 821.

[19]  *See Williams*, 579 U.S. at 8-9; *Caperton*, 556 U.S. at 883-84; *Lovoie*, 475 U.S. at 821-22; *Ward v. Monroeville*, 409 U.S. 57, 60 (1972); *Tumey*, 273 U.S. at 523; *Murchison*, 349 U.S. at 136.

[20]  *Caperton*, 556 U.S. at 884 (when "person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent"); *Lavoie*, 475 U.S. at 822-24 (judge who was a named party to a lawsuit in a different case that could benefit from judge's appellate ruling in the case at hand); *Ward*, 409 U.S. at 60 (mayor with significant executive responsibilities to maintain village finances also responsible for deciding whether defendant was guilty and had to pay fees the village would receive); *Tumey*, 273 U.S. at 531-33 (mayor who caused himself and town to receive money out of fees assessed by himself as judge if defendant found

judge's personal views can give rise to inferred bias in violation of due process. In fact, the Court has said that matters of personal bias "would seem generally to be matters merely of legislative discretion."[22]

Applicant relies on two recent Supreme Court cases that have held racial discrimination to be an improper basis for decision-making. He claims that these cases support his contention that a judge's views alone can create a constitutional violation, but they show the opposite.

In *Pena-Rodriguez v. Colorado*, the Supreme Court held that a rule prohibiting testimony from a juror to impeach a jury's verdict could not be allowed to bar a juror from coming forward with "compelling evidence that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict."[23] But the Court's holding was not that the anti-impeachment rule could be overcome simply by a juror's personal racial animus. It is only when a juror *acts* on his personal animus—when the animus motivates his vote— that due process is implicated.

In *Buck v. Davis*, the Supreme Court found it constitutionally improper for a witness to testify

---

guilty).

[21] *Williams*, 579 U.S. at 8-11 (judge who had previous significant, personal involvement in a critical trial decision as a prosecutor in the case); *Murchison*, 349 U.S. at 139 (an officer who acted as both grand jury and judge). In some situations, there can be both a financial interest and a conflict of interest. *See Ward*, 409 U.S. at 60 ("Plainly that 'possible temptation' may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a 'situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial.'")

[22] *Lavoie*, 475 U.S. at 820 (quoting from *Tumey*, 273 U.S. at 523) ("Thus matters of kinship, *personal bias*, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion.") (emphasis added).

[23] 580 U.S. 206, 211 (2017).

that a defendant's race made him more likely to be a future danger to society.[24]  Such testimony, of

course, directly linked race to an issue to be decided in the case.  If the witness had merely held that

belief, and had not testified to it at trial, there would have been no constitutional violation.  The

violation arose only when he voiced the thought at trial.  *Pena-Rodriguez* and *Buck* are entirely

consistent with the Supreme Court's holdings in the context of judicial bias that personal bias alone

does not violate due process.

### C. Claim of "Actual Bias" Incorrect

#### 1. *Federal Statutory Recusal Cases Do Not Apply Here*

As I explained earlier, a finding of "actual bias" requires a showing that the judge in fact

unfairly tilted the playing field against the defendant.  The Court relies on *Liteky v. United States*[25]

and *Berger v. United States*[26] for the proposition that actual bias can be shown through the judge's

out-of-court comments alone.  The Court cites these cases as support for a conclusion that judicial

bias in violation of due process can be found when a judge's comments derive from an "extrajudicial

source" and show a "deep-seated . . . antagonism that would make fair judgment impossible."[27]  The

Court finds that the anti-Semitic comments that Judge Cunningham allegedly made in relatively

private settings derive from an extrajudicial source—his anti-Semitism—and display the "deep-

seated" antagonism referred to in *Liteky*.  There are two problems with the Court's analysis.

First, the issue of bias in *Liteky* and *Berger* arose from a pre-trial statutory recusal motion in

---

[24]  580 U.S. 100, 119 (2017).

[25]  510 U.S. 540 (1994).

[26]  255 U.S. 22 (1921).

[27]  *See Liteky*, 510 U.S. at 555 (ellipsis inserted).

the federal system.[28]  The recusal statute at issue in *Berger* stated in part:

> Whenever a party to any action or proceeding, civil or criminal, shall make and file an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against him or in favor of any opposite party to the suit, such judge shall proceed no further therein, but another judge shall be designated in the manner prescribed in the section last preceding, or chosen in the manner prescribed in section twenty-three, to hear such matter. Every such affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists.[29]

That makes those cases materially different from the present case.  Because *Liteky* and *Berger* were recusal cases (not disqualification cases) based on a federal recusal statute (and not the Constitution) they do not speak at all to the requirements of due process.  Non-constitutional recusal requirements are, obviously, intended to be more protective than due process.  Recusal requirements can include looking ahead to what might occur based on a judge's attitudes, but a due-process inquiry, other than one based on interest, looks back to see whether the judge acted in violation of the Constitution.[30]  *Liteky* and *Berger* have no bearing on this case.

Second, the Court says it discerns no reason that the "basic reasoning about actual judicial bias (evidenced by in-court speech and behavior) should not also apply to a judge's pervasive patterns of speech and behavior outside of the courtroom."  But there is a material difference between in-court comments and out-of-court comments.  The Court breaks new ground by holding

---

[28]  *See Liteky*, *supra* at 542-43*; Berger*, 255 U.S. at 27.

[29]  *Berger*, *supra* at 26 (quoting Section 21 of the Judicial Code).

[30]  *Berger* also pointed out the lack of harm to the administration of justice when the issue is raised pretrial: "And in this there is no serious detriment to the administration of justice nor inconvenience worthy of mention, for of what concern is it to a judge to preside in a particular case; of what concern to other parties to have him so preside?" 255 U.S. at 35.  Administration of justice concerns become far more serious when a challenge to the judge is raised after conviction and sentence.

that a judge's out-of-court comments about his personal beliefs can, and in this case do, violate a

defendant's due process rights.

Applicant also contends that *United States v. Brown*[31] is similar to the present case. The Fifth

Circuit reversed in *Brown* on the basis of "the appearance of judicial bias."[32] The court cited both

*In re Murchison* (a due process case) and a recusal statute,[33] and it appears to have conflated the due-

process and recusal inquiries.[34] Because it conflated the two concepts, *Brown* does not provide

persuasive guidance in this case.

### 2. *No Evidence Suggests the Judge Tilted the Playing Field Against Applicant at Trial and at Least Some Evidence Affirmatively Suggests He Did Not*

We are not concerned in this case with whether a judge's derogatory views about a certain

class of people directly affected a guilt or punishment determination. Judge Cunningham did not

decide guilt or punishment. In a Texas death-penalty case, a jury decides both of those things.[35] If

the jury answers the special issues a certain way, the judge imposes a death sentence, but that

---

[31] 539 F.2d 467 (5th Cir. 1976).

[32] *Id.* at 469-70.

[33] *Id.*

[34] *See id.* at 469-70 ("Like statements of the principle as to the 'appearance of justice,' within the fair trial concept, are found in many other decisions and have now been codified in the new recusal statute, which requires mandatory disqualification of a judge 'in any proceeding in which his impartiality might reasonably be questioned,' or 'where he was a personal bias or prejudice concerning a party.' To say more will unduly lengthen this decision.").

[35] *See* TEX. CODE CRIM. PROC. arts. 1.14(a) ("a defendant in a capital felony case may waive the right of trial by jury only in the manner permitted by Article 1.13(b)"); 1.13(b) (defendant may waive a jury in a capital felony case in which the State does not seek the death penalty if the State consents), 37.071, § 2 (b)-(f) (jury charged with answering punishment issues in death-penalty case).

imposition is purely ministerial, based solely on what the jury does.[36]

And no one contends that Judge Cunningham made any derogatory comments about any class of people—based on religion or otherwise—during *any* judicial proceedings, much less in front of Applicant's jury. In fact, several times during the trial, Judge Cunningham emphasized the importance of making sure the defendant had a fair trial.[37]

The crucial question in this case is whether the judge's actual rulings suggest that there was a due process violation—whether Judge Cunningham's rulings provide some indication that his views influenced his conduct of the trial. Do the rulings themselves indicate bias?[38] That might occur if a significant number of rulings against the defendant are clearly erroneous, or perhaps if a few significant rulings are clearly in error. We could also look to see if discretionary rulings went against the defendant and if the record, though supporting a particular discretionary ruling, also preponderates against it. An example of a supported, but preponderated-against discretionary ruling might be the denial of a challenge for cause against a vacillating veniremember, whose statements include enough to uphold the trial court out of deference but, when taken as a whole on independent review, favor a conclusion that he was challengeable. The "close scrutiny" called for in this sort of

---

[36] *See id.* art. 37.071, § 2(g).

[37] *See* 5 RR 16 (admonishing veniremembers that jurors have to accord the defendant the presumption of innocence, follow the law, and be fair, and if they cannot, "I cannot use you."), 9 RR 5 (conversation about stun belt and keeping jury from seeing that Applicant was restrained), 40 RR 5-6, 8 (admonishing jurors not to do independent research but consider only evidence offered at trial), 47 RR 120 (Applicant's outburst, discussed *infra*).

[38] Applicant suggests that because the claimed error is structural, and therefore exempt from a harm analysis, we should not look at the record to determine the impact of the judge's views on the trial. But the inquiry here is not a harm analysis, but an inquiry into whether the judge's rulings show, or at least suggest, that he acted with bias in violation of due process.

inquiry[39] would not seem to require establishing a direct link between judge's views and his rulings. Rather, we should consider whether, in light of the judge's views, the rulings provide a firm suspicion that the judge's views affected his rulings. Here, they do not.

We would expect a complaining applicant to bring examples of potentially biased rulings to our attention. That view is consistent not only with the habeas applicant having the burden of proof, but also with the fact that we would expect the complaining party to notice any questionable rulings. If the habeas applicant has not pointed out a particular ruling, a reviewing court can rationally infer that there is nothing remarkable about that ruling that would suggest the potential for bias. Of course, simply reciting a laundry-list of rulings without explanation would be insufficient. We would also expect the habeas applicant to explain why he thinks a particular ruling might indicate bias. In these habeas proceedings, Applicant has directed this Court to only four actions by the trial court that he views as questionable. He has argued why he thinks these actions are questionable, and so I address each of them. I also find it appropriate in this case to address jury selection issues, even though Applicant has not specifically complained about them. Discretionary rulings are a staple of jury selection, and the rulings here affirmatively suggest that the judge did *not* slant his rulings in the State's favor.

### a. *The Outburst*

I start with the four instances alleged by Applicant. The first concerns his outburst about the behavior of the prosecuting attorneys during his testimony. While Applicant was testifying about whether he had any visitors while he was incarcerated, the following occurred:

THE DEFENDANT: Your Honor, can you please tell them to stop staring at me like

---

[39] *See Minor*, 469 S.W.2d at 580.

that? The DAs?

THE COURT: They're just listening to the testimony.

THE DEFENDANT: I understand, but they're making strange faces and things like that and it's making me uncomfortable and nervous.

Q. (By [trial defense counsel]) You understand you are on the witness stand?

A. Yes, sir.

Q. You understand that because we are on direct examination, at some point in time the State is going to have the right to ask you questions?

A. Yes, sir.

Trial counsel then proceeded to question Applicant about mail he had received while incarcerated.

After about 1 ½ pages of testimony, Judge Cunningham said, "[Trial counsel], I need you to mark your spot right there. We have to break." After the jury left the courtroom, the following occurred:

THE COURT: Let the record reflect the jury has retired for the noon hour. Mr. Halprin, you put me in a very bad position. I don't really want to respond to your request in front of the jury. You should have waited until now.

THE DEFENDANT: Yes, sir.

THE COURT: Now, Mr. D'Amore, the one in the middle, he generally has a scowl all the time. That's just his demeanor. I have not seen any overt reactions. If I do, I will get in the middle of it.

THE DEFENDANT: Yes, sir.

THE COURT: They know what is required and proper courtroom decorum. This is probably the first time you have had a direct line of sight and I saw Mr. Wirskye and Mr. D'Amore whispering to each other and making notes, but I didn't see any overt reactions. But, I mean, I'm not going to get in the middle of it before the jury unless I have to.

THE DEFENDANT: Yes, sir, I apologize.

THE COURT: No, this is your trial, Mr. Halprin. My job is to be sure you get a fair one. Stand in recess until 1:30.

MR. SHOOK: Judge, could [sic] let the record reflect that, at least I can speak for myself, I wasn't making any funny faces in the courtroom during Mr. Halprin's testimony. I believe that's how he referred to it as.

THE COURT: I didn't see any.

[TRIAL COUNSEL]: We would just ask the Court to instruct counsel for the State not to be making faces.

MR. SHOOK: I will just keep my regular old face that I always have.

MR. D'AMORE: I'll keep that same scowl you've seen, Judge.

MR. WIRSKYE: I will keep my same blank look, Your Honor.

The hearing then ended, with Applicant's testimony resuming after lunch.

Nothing about the judge's behavior during this incident seems out of the ordinary. What was out of the ordinary was Applicant's outburst. All of the other trial participants—the judge, the prosecutors, and Applicant's own attorneys—seemed to think that the prosecutors' courtroom behavior was unexceptionable. The judge handled the outburst with professionalism in front of the jury. The judge did admonish Applicant outside the jury's presence, but it seems to have been for Applicant's benefit, to keep him from looking bad in front of the jury. And while Applicant alleged the judge was stern in admonishing him, any sternness seems to have been mitigated by the judge acknowledging that Applicant had not previously observed the prosecutors from the witness stand, assuring Applicant that the judge would get involved if necessary, and telling Applicant that it was "your trial" and the judge was just trying to make sure it was fair.

b. *The Ranking Document*

At the punishment stage of trial, Applicant attempted to introduce into evidence Defense

Exhibit 39, which appeared to be a TDCJ document ranking all the Texas Seven offenders by leadership qualities. At the top, the document says "TDCJ CONNALLY UNIT." In an introductory paragraph, the document says:

> After conducting interviews with civilian workers, correctional officers, and several inmates who worked closely with the escapees, a consensus was developed of which offender was the leader and which one may be the weakest. It was unanimous decision that RIVAS was the leader and the weakest was determined to be HALPRIN.

The document went on to list the Texas Seven offenders in order of leadership ability with details about each. About Applicant, the document said:

> [He] was quiet and never exhibited leadership qualities. Was consistently worried about whether his work was acceptable to the civilian workers. Very submissive characteristic. This worrisome attitude was seen to escalate a month before the escape. One civilian worker speculated whether HALPRIN was undergoing some type of depression.

The defense first attempted to introduce the document through S.O. Woods, a former assistant director at the Texas Department of Criminal Justice (TDCJ), Institutional Division . Under questioning by the prosecutor, Woods acknowledged that he did not put the document together and did not even know where the information came from. At that point, the prosecutor lodged a hearsay objection, and Judge Cunningham sustained it. Trial counsel asked if Woods had any reason to believe the document did not come from TDCJ. Woods responded that it appeared to be from the Office of Inspector General (OIG) and that he recalled seeing it in boxes at the OIG.[40] He affirmed that he had specifically brought the document to trial counsel's attention. The prosecutor reurged his objection, which was sustained.

The defense later questioned Elizabeth Mullen, an OIG inspector, about the document.

---

[40] The escape of the Texas Seven prompted an investigation of the Connally unit.

Mullen had never seen the document until the day of her testimony, and she did not know who generated it. She testified, presumably from looking at the document's header, that it appeared to have been generated from the Connolly Unit.

The next day, the defense sought again to admit the document. Judge Cunningham declined to do so because it was hearsay:

> It's a TDCJ document. No question about its authenticity. That's not the issue. The issue is that the conclusions on the entire document are all from hearsay from unnamed sources. That's the problem with the document.

A prosecutor interjected, "We didn't know who made it, either," and Judge Cunningham continued:

> You don't know who the author is, you don't know where the conclusions came from, you can't go back and find out any of the source information that that ultimate opinion comes from. So I have reviewed 39, I understand your objections. No question about its authenticity. It's simply not admissible because of hearsay.

Defense counsel asked the court to clarify that it was not admitting the document as "a business document made during the course and scope of the record keeping duties of TDC." Judge Cunningham responded, "It may be a business record, but it's all hearsay."

On appeal, Appellant complained about the exclusion of the ranking document. We concluded that "the trial court did not abuse its discretion to decide that the document did not meet the business records exception to the hearsay rule."[41] We found "no evidence showing who prepared the document or whether it is a record of regularly conducted activity."[42] We further concluded that any error in excluding the document was harmless beyond a reasonable doubt.[43] In support of this

---

[41] *Halprin*, 170 S.W.3d at 116.

[42] *Id.*

[43] *Id.*

conclusion, we noted that a TDCJ civilian employee testified that he would rank Applicant's intelligence "at the very bottom" of the Texas Seven and that another TDCJ civilian employee testified that Applicant was not "a leader type."[44] We further noted Applicant's own testimony that he was a follower and not a leader and that his participation in the victim's murder was minimal.[45] And we pointed out that trial counsel argued Applicant's lack of intelligence and leadership qualities to the jury during closing arguments at the punishment phase.[46]

At one point in cross-examining trial counsel, Applicant's habeas counsel suggested that the ruling on the admissibility of the ranking document was a "discretionary" ruling. Judges do generally have discretion in determining the admissibility of evidence, but I disagree with any suggestion that this particular ruling could have gone either way. The rules proscribing the admission of hearsay apply at the punishment stage of a capital murder trial.[47] A party has a right to insist on the exclusion of hearsay evidence unless it satisfies an exception.[48] The State objected to the evidence on the basis of hearsay, and the document clearly was hearsay.[49] So the defense needed to show that the document met an exception, and the only exception articulated by the defense was the business-records exception. But as I explain below, it was indisputable that the

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Renteria v. State*, 206 S.W.3d 689, 697 (Tex. Crim. App. 2006); *Lewis v. State*, 815 S.W.2d 560, 568 (Tex. Crim. App. 1991).

[48] TEX. R. EVID 802.

[49] *See id.* 801(d).

business-records exception was not met.

As we observed on direct appeal, there was *no evidence* showing that the document was a record of regularly conducted activity.[50] No one testified that ranking individuals in a group of escapees was a regularly conducted activity or a part of regularly conducted activities. Even assuming it was, Applicant did not have a qualified sponsoring witness.[51] Neither Woods nor Mullen were custodians of records at the Connolly unit, and neither were otherwise qualified because neither could testify to the predicate required to show admission. Mullen could not even testify that the document was in the OIG files. Nor was there a self-proving affidavit that would have obviated the need for the testimony of a qualified sponsoring witness.[52]

Even if those obstacles were overcome, the declarations in the document were hearsay within hearsay. When there is hearsay within hearsay, each level of hearsay must conform to an exception.[53] The document might have had only one level of hearsay if the conclusions it recites could have been characterized as the opinion of an expert author (or authors) of the document,[54] but that was not shown because there was nothing to show who the author of the document was nor was there anything to show that the author was qualified as an expert. Consequently, the document could

---

[50] *See id.* 803(6) ("Records of a Regularly Conducted Activity").

[51] *See id.* (". . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, *all as shown by the testimony of the custodian or other qualified witness*") (emphasis added).

[52] *See id.* (". . . or by affidavit that complies with Rule 902(10)").

[53] *Id.* 805.

[54] *See id.* 702, 705.

only be viewed as an amalgamation or summary of opinions from hearsay sources, and no attempt was made to show that these hearsay opinions met a hearsay exception.

Faced with a document that was clearly inadmissible under the hearsay rules, Applicant could have gotten it in only if its admission was required by the United States or Texas Constitution. Due process can require admission despite a rule of evidence requiring exclusion if the evidence forms such a vital portion of the case that its exclusion would deprive the defendant of a defense.[55] But Applicant's attorneys did not argue at trial that admission of the document was constitutionally required. And even if they had, the record would have to have clearly shown at the time of the judge's ruling that the constitution required admission before we might even consider whether bias is suggested by the exclusion of a document that was clearly inadmissible hearsay. And the record at the time of the judge's ruling does not show this.

Our direct-appeal opinion observed that other evidence came in that spoke to Applicant's lack of leadership qualities. I would now add that that evidence came in at the *guilt* stage of trial, so Judge Cunningham would have known that the ranking document was not the only evidence of Applicant's lack of leadership qualities.

In fact, the testimony about Applicant not being "a leader type" was made in response to a question from trial counsel to a TDCJ civilian employee about how the Texas Seven offenders compared to each other:

Q. Did you give an opinion based on your experience with these offenders as to who was most likely to be the leader and who was most likely to be the weakest of the

---

[55] *See Potier v. State*, 68 S.W.3d 657, 659-62, 665 (Tex. Crim. App. 2002) (not every exclusion of evidence favorable to the defendant denies due process; due process requires overriding a rule of evidence only when the excluded evidence "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense.").

bunch?

A. I was asked those questions. I don't remember what I – at that time I don't remember what I said. I – that was a long time ago for those specific questions like that.

Q. Do you have an opinion now?

A, Yes, sir.

Q. Okay. What is that opinion?

A. Not very good. He was – just in my opinion he was not a leader type, just that's my opinion.

Even if Applicant's own testimony about his lack of leadership qualities is seen as self-serving, there was testimony about his lack of leadership qualities from an objective source—a TDCJ civilian employee—and there was testimony from another civilian employee that Applicant was "at the very bottom" of the Texas Seven with respect to intelligence. The admission of other evidence of Applicant's lack of leadership qualities negates any possible claim that due process required the admission of the ranking document. Given that the document was clearly hearsay with no applicable exception, the trial judge would have erred to admit it.

c. *Hearsay Evidence Relied on by an Expert*

At the punishment stage of trial, Applicant called Dr. Kellie Goodness, a forensic psychologist. She was called to testify about how Applicant's background and circumstances affected him in a way that mitigated his moral culpability. The prosecutors objected to Dr. Goodness discussing hearsay information on which she relied. Judge Cunningham ruled, as a general matter, that Dr. Goodness would be allowed to offer her own opinions and that she could recite the sources of information on which she relied but that she could not discuss what those sources said. Applicant

characterizes this as a "rote application of the hearsay rule."

First, if the evidence was excluded by rote application of the hearsay rule, then its exclusion is not evidence of anti-Semitism.

But also, Judge Cunningham left open the possibility that particular hearsay statements might be admitted, subject to a limiting instruction:

> THE COURT: But my question is, the testimony as it develops, if I see a need to allow a specific issue to be before the jury, what limiting instruction does the State wish me to give?
>
> [PROSECUTOR]: You can only use it to judge the credibility of the doctor's opinion, not for the truth or evidence of a specific act.
>
> THE COURT: That's reasonable.

Judge Cunningham's ruling was in line with Rule of Evidence 705, which says in relevant part:

> When the underlying facts or data would be inadmissible in evidence, the court shall exclude the underlying facts or data if the danger that they will be used for a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial.[56]

Applicant complains that Judge Cunningham excluded "all details underlying Dr. Goodness's opinions including her conclusion that Mr. Halprin's biological parents were drug addicts . . . and an explanation of his expulsion from boarding school." Judge Cunningham's general ruling was correct and not suggestive of bias. And as discussed below, neither of the two specific rulings complained about suggest any bias.

Dr. Goodness made a "graphical" presentation of mitigating factors surrounding Applicant. It was originally a Powerpoint presentation, but because there were computer problems, it was

---

[56] TEX. R. EVID. 705(d).

presented in a slightly different format. Nevertheless, the jury was apparently presented with bullet points of the various mitigating circumstances. The defense questioning proceeded to address each bullet point, and Dr. Goodness gave some explanation of what the bullet point meant and the supporting sources.

The first bullet point involved abuse and neglect during Applicant's early environment with his biological parents. The next bullet point was titled "Genetic Vulnerability." Defense counsel asked, "What do you mean by that?" Dr. Goodness responded, "From speaking with his biological mother and reviewing the records, it is my opinion that his mother and his biological father were drug addicts." A prosecutor objected to this testimony as "going into the facts," and Judge Cunningham sustained the objection. Defense counsel did not attempt to argue that this testimony was admissible. Instead, counsel questioned Dr. Goodness on whether Applicant was predisposed to substance abuse, and she responded that he was. Counsel then asked for the sources supporting her conclusion. Dr. Goodness said it was mainly the biological mother and made an indirect reference to the biological parents being drug addicts. Counsel then asked if that was supported by any records, and she responded, "Yes, the adoption records and the CPS records."

Counsel later went through other bullet points—"Untreated Disorders in Childhood and Adolescence,"[57] "A Need for Acceptance," "Rigid Parenting," and "Drug Abuse,"—before arriving at the topic "Complete Absence of Guidance." Counsel asked her what that meant. Dr. Goodness responded that Applicant was expelled from boarding school shortly before he turned eighteen. She

---

[57] Dr. Goodness testified without objection about Applicant having learning disorders, including a writing disorder, a reading disorder, a mathematics disorder, and attention-deficit disorder. She also talked about him having struggles with depression. She testified that Applicant was not adequately treated for his disorders.

then began to testify, "When the school called Mr. and Ms. Halprin, from what I can ascertain from the academic records –," and a prosecutor lodged a hearsay objection, which was sustained. Defense counsel then said to the witness, "I'm just going to ask you what records you reviewed that you based that opinion on." When Dr. Goodness asked for clarification in how to answer the question, defense counsel said, "I just want to know what particular sources you relied on to form this opinion, not what any particular person might have told you." She then responded that she spoke to Applicant, family members, and a rabbi, and reviewed legal and academic records. Counsel then proceeded to other bullet points.

The two specific rulings Applicant points to did not disrupt the defense strategy. Rather, the rulings appeared to properly corral a witness who occasionally went beyond what counsel was attempting to elicit. If counsel thought that certain answers by the witness needed to be admitted, he could have taken that up with the judge and asked for a specific ruling on a particular point. The fact that counsel did not do so suggests that the rulings were uncontroversial.

d. *Constitutional Challenge to Statutory Anti-Parties Instructions*

Applicant also complains that Judge Cunningham denied his motion "challenging the constitutionality of the special 'law of parties' instruction for the punishment phase as applied to his case." We have upheld the constitutionality of the statutory anti-parties punishment issue.[58] Rejecting a constitutional challenge that this Court has already rejected is not a sign of bias.

e. *Jury Selection*

Jury selection is a stage of trial where a judge could influence the outcome of the case by influencing the composition of the jury. Judge Webb Biard presided over most of jury selection;

---

[58] *Wood v. State*, 18 S.W.3d 642, 649 (Tex. Crim. App. 2000).

Judge Cunningham conducted only a relatively short part. What there is of Judge Cunningham's voir dire does not suggest that he favored the State. If anything, his rulings seem to have favored Applicant.

One significant ruling in Applicant's favor concerned the first veniremember to be questioned, Veniremember McCullin. Under questioning from the State, she at first seemed to understand and be able to follow the law on the issue of future dangerousness. She said that she believed the death penalty was appropriate in some cases, depending on what the evidence was. She agreed that she could follow instructions from the judge. When the prosecutor asked what would be important to her in answering the future-dangerousness issue, she said the defendant's background and the role he played in the crime. Later the prosecutor asked, "When you hear probability, what does that mean to you?" McCullin responded, "Well, that he would probably commit again, a crime again." The prosecutor said that law requires more than "a possibility" and that some people say it is a "51 percent type of a situation." The prosecutor then asked, "Is that comfortable to you?" McCullin responded, "Yes."

For a while, McCullin's answers to defense questioning seemed unremarkable, but at some point they became troubling. Defense counsel asked her if she believed a person who has killed a police officer in the course of his duties should receive the death penalty. She answered, "Yes." Counsel then asked, "So that person gets to the point where you've convicted them of capital murder, you believe they have committed the murder, you believe it's a police officer in the course of his duties, then at that point, Special Issue No. 1 and No. 2 are not really going to matter; correct?" McCullin answered, "Right." Counsel asked whether she would answer special issues 1, 2, and 3 "yes" once she found a defendant guilty of killing a police officer. She responded that she would

answer "yes" to special issues 1 and 2 (the future dangerousness and anti-parties issues) but would need more information before she could answer special issue 3 (the mitigation issue).

Judge Cunningham followed up with some questions of his own. He asked, "[I]f you have found someone guilty of capital murder, of killing a police officer in the line of duty . . . in your mind, would Special Issue No. 1 always be yes?" After prompting the judge to go through the question again, she answered, "Yes." The judge later asked, "But regardless, if the State didn't put anything else on, I mean, they haven't proven that to you, you say, well, he killed a police officer, therefore he's a continuing threat. Is that what's in your mind?" McCullin responded, "They would have to prove it." After asking about special issue two, Judge Cunningham returned to special issue one, and asked, "If the State proves up that the person killed a police officer . . . . But the State didn't prove up any continuing threat to society. Is your answer always going to be yes?" McCullin answered, "I would say there is a probability."

The defense challenged McCullin for cause on the basis that, after a conviction for capital murder, she would always answer the future-dangerousness and anti-parties issues "yes." The State opposed the challenge, arguing that the witness said she would follow the law and that defense counsel's questions were premised on how she felt without taking into account the law. Then the following occurred:

> [DEFENSE COUNSEL]: Judge, she wasn't asked any opinion questions. She would have said find somebody guilty of killing a police officer, intentionally killing a police officer, are you automatically going to answer Special Issue No. 1 yes, and the answer to that –
>
> THE COURT: I heard.
>
> [DEFENSE COUNSEL]: Thank you.

THE COURT: And as I said in my outline, I've got to be sure she understands the law in this case. I went through it with her again. She was doing fine for an hour and 25 minutes and then she turned around on me at the end of the program, and I don't find that she either A, understands the law, or B, will follow it.

Judge Cunningham granted the challenge for cause.

On direct appeal, a trial court's decision on a challenge for cause is reviewed for abuse of discretion.[59] We afford particular deference to a trial court's decision to deny a challenge when a veniremember's answers concerning the ability to follow the law are "vacillating, equivocating, ambiguous, unclear, or contradictory."[60] McCullin's answers were vacillating and likely included enough evidence regarding her ability to fairly answer the special issues to support a denial of a challenge for cause. Also, before a veniremember can be excused for cause for being unable to fairly decide the special issues, the law must be explained to her and she must be asked whether she can follow that law regardless of her personal views.[61] To the extent that McCullin's answers were troubling, it is arguable that the parties did not do enough to nail down whether she could follow the law regardless of how she personally felt.

Had Judge Cunningham denied Applicant's challenge for cause, the ruling would likely have been upheld on appeal. It certainly would have been rational for him to believe that it would be upheld. Indeed, Judge Biard would later deny a challenge for cause against veniremember Janssen, who presented similarly to McCullin.[62] But Judge Cunningham *granted* the defense challenge for

---

[59] *Hudson v. State*, 620 S.W.3d 726, 731 (Tex. Crim. App. 2021).

[60] *Id.*

[61] *Tracy v. State*, 597 S.W.3d 502, 512 (Tex. Crim. App. 2020).

[62] As with McCullin, Janssen's answers to the prosecutor's questions suggested that he could follow the law on the special issues, his answers under defense questioning were troubling, and his

cause against McCullin.

Judge Cunningham ruled twice in favor of the State on defense challenges for cause, but neither ruling provides a good basis for concluding that Judge Cunningham tilted discretionary rulings in favor of the State. Under questioning from the prosecutor, Veniremember Russell made some concerning statements about whether she could fairly answer the special issues after finding someone guilty of intentionally killing a police officer. She at times suggested that she would "try" to have an open mind, that someone who killed a police officer deserved the death penalty, that she would find future dangerousness in that situation unless the defense presented something to show otherwise, and that she would automatically answer the mitigation special issue "no" after answering "yes" to the first two special issues.

But she also indicated that she would in fact keep an open mind on the special issues. The prosecutor posed the hypothetical of a person who became a quadraplegic after intentionally killing a police officer. She indicated she could answer the future dangerousness issue "no" in that situation, knowing it would result in a life sentence. She later answered that she could give effect to the law that required a probability under the future dangerousness issue to be "more than a possibility." The prosecutor later asked if she saw how the answers to the special issues would be based on the facts and not her personal feelings, she responded "yes," and, when asked if she could participate in that process, she answered that she could. When asked to clarify what she meant by "trying" on the mitigation special issue, she said, "Well, it could be that I just, you know, I've heard

---

answers to the judge's questioning at the end were troubling. When asked point blank by Judge Biard if he could see the difference between "should have anticipated and actually did anticipate," which was necessary to accurately answer the anti-parties special issue, Janssen said, "I guess then, no." When the judge followed up by asking, "You do not see that difference?" Janssen responded, "No." Nevertheless, Judge Biard denied the defense challenge for cause.

some evidence in the trial that would just be overriding in my mind, that would be more important

to me than some of the circumstances involving, which would be bringing up here in Special Issue

No. 3." She later said she could look at all the evidence in light of the third special issue.

Finally, Judge Cunningham clarified to her that the defense had no burden of proof, even at

the punishment stage of trial. When he did that, Russell indicated that was a revelation to her:

> THE COURT: The law is the burden rests on the State.
>
> PROSPECTIVE JUROR: Even when it comes to the punishment stage?
>
> THE COURT: Correct. Special Issue No. 1 and 2.
>
> PROSPECTIVE JUROR: Oh, okay. I did not know that.
>
> * * *
>
> THE COURT: But his question to you is, are you going to require the defense to put on some evidence?
>
> PROSPECTIVE JUROR: No. Now that I understand that it doesn't matter which phase we're in that it's still the State that has to do the proving.
>
> THE COURT: And the third issue is there's no burden on either side, it's just taking into consideration all of the evidence?
>
> PROSPECTIVE JUROR: Correct.

Judge Cunningham allowed defense counsel to conduct follow-up questioning:

> Q. So is that resolved, how you feel about Special Issue No. 1 then? You were looking – you really were looking for something from us and we cannot, and don't have to, legally, bring it to you.
>
> A. I was – I was miss – I misunderstood that. I thought that during the punishment stage that both sides would be giving evidence as to one or the other. But now that I know that you don't have to do that, I would not need that from you to be able to say no to the first one.
>
> Q. You could say no to the first one based on what?

A. What the State has provided me with.

Even before the veniremember said that she had misunderstood the law, her answers seemed to be vacillating. And her clarification of her position on the mitigation special issue was consistent with the law that a juror does not have to consider any particular evidence mitigating.[63] While some of her statements were concerning, the epiphany she had at the end of questioning about the burden of proof at the punishment stage cast her in a new, more favorable light. Her epiphany during the judge's questioning contrasted with McCullin, who had not stood up well to the judge's questioning at the end. Consequently, the discretionary ruling denying the challenge for cause here does not suggest bias.

Judge Cunningham also denied defense challenges for cause against Veniremember O'Brien. The defense first challenged her for cause based on a mercy-killing hypothetical posed by the prosecutor. This challenge was not based on anything O'Brien said but on defense counsel perceiving that the prosecutor's mercy-killing hypothetical was improper and tainted her. With various veniremembers, the prosecutor talked about the wide range of punishment for the lesser-included offense of murder and gave a hypothetical about unplugging a family member from life support out of love to end that person's pain. This hypothetical was used to illustrate how a minimum sentence of five years for murder would make sense. The defense objected to this hypothetical at various points, and Judge Cunningham overruled the objections. On direct appeal, we addressed one such claim that the hypothetical was improper.[64] We concluded that it was not improper because the prosecutor did not attempt to bind the veniremember to resolve or refrain from

---

[63] *See Davis v. State*, 313 S.W.3d 317, 346 (Tex. Crim. App. 2010).

[64] *Halprin*, 170 S.W.3d at 121.

resolving an issue on the basis of one or more facts contained in the question.[65] The same was true

of the prosecutor's use of the hypothetical in questioning O'Brien.

I would also note that Judge Cunningham allowed the defense to push back against the

State's hypothetical, over a prosecution objection.[66]

The defense's other challenge for cause against O'Brien was a claim that she could not fairly

evaluate the anti-parties special issue. Nothing in the record even supports that challenge. Even

under an independent review of the cold record, O'Brien comes across as a thoughtful and well-

informed individual. She said we live in "a very complicated world," and she often qualified her

answers. She did respond that a fact situation in which someone knew that their accomplices had

---

[65] *Id.*

[66] The following occurred:

Q. Now, [a prosecutor] has talked about some kind of mercy killing scenario. I was going to suggest to you that in the indictment, that the killing of a police officer while he's in the official course of his duty, doesn't contemplate a mercy killing. Would you agree with that?

A. Yes, I agree with that.

Q. That's, seriously, that's not, obviously, not a fact scenario that we will be dealing with under the allegations contained in this indictment.

[PROSECUTOR]: Well, I'll object to trying to limit the fact situation to specific facts.

[DEFENSE COUNSEL]: Well, we're certainly entitled to limit the fact situations to the allegations contained in the indictment.

[PROSECUTOR]: Well, by his question he's eliminating.

THE COURT: I'll overrule at this time.

guns would suggest anticipation that a human life would be taken, but she did not take an absolute position with respect to that fact scenario. For example, the following question and answer occurred:

> Q. I thought what you said was that once somebody knowingly goes with somebody else that has a gun, then they, it appears to you, that they are willing to do whatever conduct is necessary to insure that they are going to be able to escape, whether it's kidnapping, or hold somebody hostage, or kill somebody. And that seems – and that, to me, is more than what it takes to be found guilty of capital murder. And if that's your mindset, that sounds like to me that you are answering Special Issue No. 2 yes.

> A. Well, I'm saying that that could be. I'm speaking in generalities, not specifics. If you are a willing participant, then it could be that you should be found guilty or you could go to the death penalty or whatever. But I'm not saying that that necessarily. It would depend on the evidence.

O'Brien was not even a vacillating veniremember. None of her responses suggested that she was challengeable for cause.[67]

Finally, I would observe that Judge Cunningham denied one of the State's challenges for cause. In an unusual role-reversal, the State challenged Veniremember Tarrant for cause on the basis that he would always answer the future-dangerousness issue "yes," while the defense argued that Tarrant could keep an open mind on the issue. When Judge Cunningham denied the challenge for cause, the State exercised a peremptory strike. The parties' role-reversal on this veniremember suggests that both thought him to be favorable to the defense, but, in any event, Judge Cunningham's ruling caused the State to use one of its peremptory strikes.

### 3. *Bias Not Conveyed by Judge's Demeanor*

As I alluded to earlier, the trial record does not show any anti-Semitic comments made by

---

[67] After the challenge for cause was denied, trial counsel immediately said the defense would exercise a peremptory. A prosecutor then said, "For the record, we accept." Judge Cunningham asked trial counsel, "[Y]ou don't want to ask the State what they're going to do first?" Trial counsel responded that he suspected the State would accept the veniremember.

the judge in any of the trial-level proceedings. In fact, the judge at points emphasized the importance of according Applicant a fair trial. A judge's demeanor, of course, would not typically be reflected in the trial record.

One of Applicant's experts at the habeas hearing suggested that there is a danger that demeanor that is influenced by biased views might not be reflected in the record. Whatever the merits of that concern as a general matter, the record in the current habeas proceedings affirmatively supports a conclusion that Judge Cunningham's demeanor was not affected by any anti-Semitic views. Both Applicant's trial counsel and the bailiff testified to seeing no evidence of bias by Judge Cunningham in the courtroom, and the habeas court found this testimony credible. Although this testimony might not be sufficient to establish that Judge Cunningham did not *harbor* anti-Semitic views, it strongly supports a a conclusion that he did not *display* such views, even through his demeanor.

Applicant's Section 5 arguments for why he should be allowed to file a subsequent writ further support this conclusion. Applicant says that he would have had no reason to know that Judge Cunningham harbored any anti-Semitic views until a Dallas Morning News article was published in 2018, and with this I agree. For fifteen years after his trial, neither Applicant nor his attorneys had any reason to suspect Judge Cunningham of such views. Neither did any other attorneys or parties who came before the judge. What seems obvious is that, if Judge Cunningham had anti-Semitic views, he was able to completely conceal them from those who participated in Applicant's trial (and any other trials presided over by the judge).

### 4. *Out of Court Statements by Judge Cunningham*

The concurring opinions make much of Judge Cunningham's out-of-court statements. Some

of these involved expressions of anti-Semitism, and one did not: "I'm going to get them all the death penalty, even the driver, because he's guilty."

But these are out-of-court statements. The Supreme Court, even after *Caperton*, has never held that a judge's personal opinions that are expressed only outside the courtroom can violate due process. Neither anti-Semitic beliefs nor out-of-court statements about them are a basis for disqualification. The statement about getting the death penalty "because he's guilty" is not even an expression of anti-Semitism. And, of course, in Texas, the judge does not determine the appropriate sentence in a death-penalty case; that role belongs solely to the jury.[68]

Caselaw indicates that out-of-court statements like these should cause us to closely scrutinize a judge's rulings to determine whether they provide a firm suspicion "that the judge's views affected his rulings." But there is still a requirement to show that a judge's personal beliefs have affected his conduct of the trial. A pattern of erroneous rulings, or questionable discretionary rulings, could result in relief to a defendant. But as I have shown, that did not happen in this case.

### III. CONCLUSION

Applicant has failed to show that Judge Cunningham's *conduct during the criminal proceedings*–his rulings, his demeanor, his comments, or anything else–was influenced by any derogatory views. I would hold that Applicant has not shown that Judge Cunningham acted as a biased judge in violation of due process. Because the Court holds otherwise, I respectfully dissent.

Delivered: November 6, 2024
Publish

---

[68]   *See* TEX. CODE CRIM. PROC. art. 37.071, § 2 (b)-(f) (jury charged with answering punishment issues).